STATE OF MAINE et al., Plaintiffs, Appellants,

v.

Juanita M. KREPS et al., Defendants, Appellees.

No. 77-1337.

United States Court of Appeals, First Circuit.

Aug. 16, 1977.

and then granted defendant's motion for summary judgment and dismissed the complaint. Plaintiffs appealed, seeking expedited review of the dismissal in this court.

Edward F. Bradley, Jr., Asst. Atty. Gen., Augusta, Maine, for plaintiffs, appellants.

William Brian Morrison, Atty., Dept. of Justice, with whom James W. Moorman, Acting Asst. Atty. Gen., Bruce C. Rashkow, and Michael W. Reed, Attys., Dept. of Justice, Washington, D. C., were on brief, for defendants, appellees.

Before COFFIN, Chief Judge, and CAMPBELL, Circuit Judge.

LEVIN H. CAMPBELL, Circuit Judge.

This is an action brought by the State of Maine [1] seeking a declaration that the quotas set by the United States Secretary of Commerce for foreign fishing of herring stock in certain offshore waters of Maine is in violation of the Fishery Conservation and Management Act, 16 U.S.C. § 1801 et seq., (the "Act"). The area, so called 5Z–SA6, includes the Georges Bank fishing grounds. The Secretary published regulations under the Act governing herring fishing on February 11, 1977, and the plaintiffs brought this challenge on February 28. At the plaintiffs' request, the Department of Commerce reexamined its quotas, and the district court postponed taking action until the review could be completed. The administrative record was reopened and hearings were held on April 19 and 20. On May 13, the Department announced it would not change the limits set on the herring catch, although it did make one minor modification in the rules for tabulating the catch. On July 18, the district court held a hearing

The Fishery Conservation and Management Act, enacted on April 13, 1976, established a two hundred mile fishery conservation zone around the United States within which fishing by foreign vessels is prohibited, except to the extent authorized by the Act. To coordinate the various economic, ecological, and other interests in fish stock, § 1852 of the Act established eight Regional Fishery Management Councils, each with authority to prepare and submit to the Secretary of Commerce a fishery management plan for the species within its geographical area. Section 1821(g) provides that in the event the Secretary is notified that eligible foreign vessels have applied for permission to fish in protected waters and she determines that a management plan for the species sought to be fished will not be prepared by the appropriate regional council before March 1, 1977, she shall prepare a preliminary fishery management plan for those species. To the extent practicable, the Secretary is required to adhere to the same procedures of notice and hearing and same substantive standards that the regional council would have used had it promulgated a plan. 16 U.S.C. §§ 1821(g); 1851–61.

Before enactment of the Fishery Conservation and Management Act, the Georges Bank fishery had been managed by the International Commission for the Northwest Atlantic Fisheries (ICNAF), an international organization from which the United States withdrew at the end of 1976. ICNAF had a spotty record as a conservator of fishing resources, and in particular had permitted the Georges Bank herring stock to sink below acceptable levels.[2] In

---

1. The plaintiffs here are the State of Maine, its Governor, Commissioner of Marine Resources, and a representative to the New England Regional Fishery Management Council, who also is president of a canning business that will depend heavily on the herring catch.

2. According to Dr. Vaughn Anthony, the Deputy Chief of the Northeast Fisheries Center of the National Marine Fisheries Service and a member of the herring working group of ICNAF, the Commission had achieved the following management record:

recent years, however, the member nations had begun to recognize the long term dangers of a depleted fishing stock and gradually reduced their catches. At a meeting of ICNAF delegates in June, 1976, the scientific advisory committee reported that 50,-000 metric tons (M.T.) could be taken from the Georges Bank herring stock in 1977 without further decreasing the school population. The Commission agreed to reduce this quota to 33,000 m.t. to permit some replenishment. The allocation of the agreed maximum catch among the member nations took place at a meeting in December, 1976, shortly before the American withdrawal.[3] The United States originally had sought a quota of 18,000 m.t. for its own fishermen but agreed to a reduction to 12,000 m.t. in return for economic conces-

sions from the Federal Republic of Germany and acceptance by all the members of a limited fishing season for foreign fishermen.

■ Because the New England Regional Council would not be able to prepare a management plan for Georges Bank by the March 1 deadline, and in anticipation of applications to fish the area by foreign vessels, the Secretary prepared a draft preliminary management plan in September, 1976. Hearings were held, comments were received and responded to, and the final plan was published in February, 1977. The Secretary then determined the "optimum yield" of herring for the duration of the plan, a key factor which the Act requires to be ascertained.[4] She also estimated that a

Note 2—Continued

| Year | Scientists' Recommended Catch | ICNAF Quota | Catch | Potential New Stock | Stock Size at End of Season |
|------|------|------|------|------|------|
| 1972 | 50–90 | 150 | 174 | 96 | 146 |
| 1973 | 83–135 | 150 | 199 | 496 | 359 |
| 1974 | 150 | 150 | 146 | 85 | 285 |
| 1975 | 90–150 | 150 | 146 | 85 | 204 |
| 1976 | 60 | 60 | 42 | 85 | 234 |
| 1977 | 50 | 33 | 28 * | 85 * | 260 * |

all figures in metric tons       * predictions

Scientists advising ICNAF had determined that a stock size below 225,000 m.t. might lead to "recruitment failure", or irreversible depletion. Dr. Anthony testified that the catches in excess of quota for 1972 and 1973 were caused by ICNAF's inability to control the fishing of the German Democratic Republic, not then a member of ICNAF. The estimated catch for 1977, which is lower than the quota, is based on an expectation that the United States fishermen will not consume their entire allocation. The variations in stock size that occurred in spite of fairly similar catches was caused by fluctuations in the number of fish joining the school each year. Dr. Anthony indicated that scientists were unable to anticipate the size of annual recruitment to the stock with great exactitude.

The overall failure of ICNAF to manage the fishing resources under its control, particularly the haddock stock, was a factor in Congressional enactment of the Fishery Conservation and Management Act. *See, e. g.*, 16 U.S.C. § 1801(a)(4); H.R.Rep.No.445, 94th Cong., 1st Sess. 48 (1975); Senate Commerce Comm., Memorandum on S. 961 to the Senate Foreign

Relations Comm., 94th Cong., 1st Sess. 3–4 (Comm.Print 1975).

3. The 21,000 m.t. foreign allocation for 1977 was apportioned as follows:

| | |
|------|------|
| Poland | 5100 m.t. |
| German Democratic Republic | 4825 |
| Federal Republic of Germany | 4725 |
| Soviet Union | 3400 |
| Canada | 1000 |
| France | 1000 |
| Cuba | 700 |
| Bulgaria | 100 |
| Romania | 100 |
| Others | 50 |

4. 16 U.S.C. § 1802(18) provides:

The term "optimum", with respect to the yield from a fishery, means the amount of fish—

(A) which will provide the greatest overall benefit to the Nation, with particular reference to food production and recreational opportunities; and

(B) which is prescribed as such on the basis of the maximum sustainable yield from such

portion of this quota would be harvested by United States fishermen and remitted the balance to be apportioned among foreign fishermen.[5] Following the ICNAF guidelines, the Secretary determined that the optimum yield for Georges Bank herring in 1977 would be 33,000 m.t. and the United States share would be 12,000 m.t.[6] The remainder was allocated according to the ICNAF quotas negotiated in December.

The evidence before the Secretary indicated that present stocks in Georges Bank approximate 218,000 m.t., 7,000 m.t. below the level at which recruitment failure of herring is feared (225,000 m.t.). It was projected that an allowed yield of 33,000

fishery, as modified by any relevant economic, social, or ecological factor.

Maximum sustainable yield (MSY), a term not defined by the Act, refers to a scientific appraisal of "the safe upper limit of harvest which can be taken consistently year after year without diminishing the stock so that the stock is truly inexhaustible and perpetually renewable." H.R.Rep.No.445, 94th Cong., 1st Sess. 48 (1975). Counsel for both sides informed this court at oral argument that, by its reference to a constant amount to be taken each year, maximum sustainable yield referred to a healthy, not a depleted stock. In the case of Georges Bank herring, Dr. Anthony testified during the April administrative hearing that MSY would be 100,000 to 150,000 m.t., if the presently depleted stock were to grow to its proper size, estimated to be 350,000 to 500,000 m.t.

The legislative history of the Fishery Conservation and Management Act indicates both Congressional recognition of the precise scientific meaning of maximum sustainable yield and dissatisfaction with the manner ICNAF had employed the concept:

The concept of maximum sustainable yield is well understood, not only by expert fisheries biologists, but by fishermen also. For this reason, there was considerable support before the Committee for adopting MSY as the basis for management. On the other hand, a responsible body of opinion supported the proposition that the Committee should not give statutory recognition to MSY since it was felt that the concept had been discredited as an effective management tool, largely as a result of the notable failures of the International Commission for the Northwest Atlantic Fisheries under the ICNAF Convention. The Committee believes that the failure of ICNAF has not discredited MSY as a management tool, but rather points up clearly the fact that MSY is only a tool and cannot be expected to accomplish anything in the absence of a sound, comprehensive management system. The Committee believes that MSY must be established for each managed species before intelligent decisions regarding optimization can be achieved.

H.R.Rep.No. 445, 94th Cong., 1st Sess. 48 (1975).

The legislative history then describes in detail the manner in which the optimum yield standard is to apply:

Once the MSY of the fisheries or stock has been determined with reasonable scientific accuracy, and the same determination made with respect to the total biomass of an ocean area where many different, but inter-related fisheries occur, the developer of a management plan can begin to think in terms of the optimum sustainable yield (OSY). Thus while biologists in the past have tended to regard any unused surplus of a fishery as waste, the resource manager may well determine that a surplus harvest below MSY will ultimately enhance not only the specific stock under management, but also the entire biomass. Conversely, the fisheries manager may determine that the surplus harvest of the entire biomass must be reduced substantially below MSY, in order to restore a valuable depleted stock which is taken incidentally to the harvesting of other species in this biomass. An example of such a situation has occurred in the Northwest Atlantic where mindless overfishing for haddock has virtually wiped out the species. A zero quota for haddock will not permit that species to restore itself since other fisheries in the Northwest Atlantic cannot be conducted without taking haddock. . . .

The concept of optimum sustainable yield is, however, broader than the consideration of the fish stock and takes into account the economic well-being of the commercial fisherman, the interests of recreational fishermen, and the welfare of the nation and its consumers. The optimum sustainable yield of any given fishery or region will be a carefully defined deviation from MSY in order to respond to the unique problems of that fishery or region.

*Id.* at 48–49.

5. 18 U.S.C. § 1821(d) provides:

The total allowable level of foreign fishing, if any, with respect to any fishery subject to the exclusive fishery management authority of the United States, shall be that portion of the optimum yield of such fishery which will not be harvested by vessels of the United States, as determined in accordance with the provisions of this chapter.

6. The draft plan had set the American share at 18,000 m.t., reflecting the United States position going into the December ICNAF meeting. The figure subsequently was revised downward to match the compromise arrived at there.

m.t. in 1977 will permit the herring stocks to increase by some ten to thirteen percent by 1978, bringing the stock to a level of 247,000 m.t.[7] Even so, that level will be substantially below the 350,000–500,000 m.t. level which experts regard as an appropriate, healthy stock for the area. Until the stock can be rebuilt to that level, it would obviously be imprudent to allow fishermen to catch herring at the rate of 100,000 to 150,000 m.t. per annum, the figures said by the Government's expert to be the area's "maximum sustainable yield".[8]

Maine argues that since the stock has declined to well below the norm for a healthy stock, and is indeed below the 225,000 m.t. "danger" level, the Act must be construed to ban foreign fishing altogether. The allowable level of foreign fishing under the statute "shall be that portion of the optimum yield . . . which will not be harvested by vessels of the United States". § 1821(d). Maine attacks the Secretary's 33,000 m. t. optimum yield figure as too high, and the Secretary's allocation of 12,000 m.t. to U.S. vessels as too low.

■ Maine's second point is readily disposed of. The Secretary's assessment of domestic fishing potential was supported by substantial evidence in the record. American fishermen have taken an average of 2,000 m.t. annually from Georges Bank since 1960 and have never exceeded an annual catch of 4,600 m.t. during that period. In 1976 domestic fishermen took 735 m.t. from the stock. Although evidence was presented to the agency indicating a growing desire on the part of American fishermen to increase their herring take from Georges Bank, the Secretary heard and credited evidence as to the economic infeas-

ibility of greatly expanded fishing operations at this time. Contrary to Maine's contention, the plaintiffs had sufficient notice that economic considerations would be a factor in weighing the potential domestic catch. The district court properly sustained the portion of the preliminary management plan that estimated the potential American catch for 1977. This figure, of course, is subject to further consideration for future years.

Turning to Maine's attack on the optimum yield estimate, it is to be noted that Maine does not quarrel with the basic data testified to by Dr. Anthony, the Government's expert. Maine accepts his thesis that a yield of 33,000 m.t. will allow for at least a ten percent recoupment of the stock in 1977, although it points out that the stock is now dangerously depressed.

The state's chief contention is that where an area's stock is so depressed as to be unable to maintain fishing at the level of the maximum sustainable yield, priority has to be given to cultivating a surplus so as to rebuild the stock as rapidly as possible, with only U.S. fishing to be allowed.

■ So stated, we have to agree with the district court that the argument is without support in the Act. We find nothing in the Act which declares that all foreign fishing is to be disallowed whenever stocks are incapable of sustaining the MSY. The statute does, it is true, give first crack at the "optimum yield" to U.S. fishermen. Only such portion thereof "as will not be harvested by vessels of the United States" is available to foreign vessels. But we find nothing in the Act which prescribes a particular annual rate at which a below-par stock need

7. These estimates of stock size, which were used in the preliminary management report published in February, were based on an assumption that the total 1976 catch would be 60,000 m.t. Subsequent developments produced a revision of the figures. Dr. Anthony testified in April that, while all reports were not yet in, the total catch for 1976 probably would be 42,000 m.t. Consequently he projected an initial size for the 1977 stock of 234,000 m.t. and a final size, assuming a 33,000 m.t. optimum yield, of 260,000 m.t. See note 2 supra.

8. See note 4 supra. The February preliminary management plan had projected an optimal size for the Georges Bank herring stock, at which a maximum sustainable yield of 150,000 m.t. would be attained, of 500,000 m.t. Dr. Anthony, relying on new data developed since the issuance of the plan, testified in April that the optimal size probably was less than 500,000 m.t. and could be as low as 350,000 m.t., resulting in a correspondingly lower MSY.

be rebuilt. To be sure, the strong conservation and management aims of the Act clearly preclude the setting of an optimum yield which permits overfishing, see 16 U.S.C. § 1801; but the Secretary's present allotment is based on credible evidence that 33,000 m.t. will allow a ten percent increase in the stock. We cannot say this rate of increase is too slight to promote the purposes of the Act.

█ Maine is on firmer ground, however, insofar as it questions the adequacy of the present record to show that the Secretary considered fully the Act's definition of optimum yield in promulgating the 33,000 m.t. figure. The "optimum" yield, as defined in the Act, must be selected "on the basis of" the maximum sustainable yield as modified by "any relevant economic, social or ecological factor". In addition, the optimum yield must be such as "will provide the greatest overall benefit to the Nation, with particular reference to food production and recreational opportunities". Arguably the Nation would be better benefitted by leaving in the sea the 21,000 m.t. allotted to foreign vessels, thus allowing a faster buildup of stock. Or, put another way, the optimum yield figure should perhaps be no higher than what is likely to be taken by United States vessels, thus leaving nothing for the foreigners. There is virtually nothing in the record to reflect a rational weighing of these considerations by the Secretary. To the contrary, there is some suggestion that the Secretary may have uncritically taken ICNAF's total allowable catch figure on the assumption that optimum yield and total allowable catch were the same thing. However, optimum yield requires a finding, among others, that the figure selected reflects the greatest overall benefit to this nation.

█ This is not to question that the "greatest overall benefit to the Nation" criterion, and the companion reference to "relevant economic, social or ecological" factors, both found in the 16 U.S.C. § 1802(18) definition of "optimum" yield, are broad enough to include such national benefits as are to be derived from permitting foreign fishing. While the Act, in its preamble, makes clear that it was enacted in reaction to the ineffectiveness of international fishery agreements to prevent overfishing, § 1801(a), it speaks of a purpose, among others, to encourage such international agreements in the future, and to encourage continued active United States efforts to obtain an internationally acceptable treaty at the upcoming Third United Nations Conference on the Law of the Sea. § 1801(c)(5). Congress plainly did not intend the cardinal aim of the Act—the development of a United States' controlled fishing conservation and management program designed to prevent overfishing and to rebuild depleted stocks—to be subordinated to the interests of foreign nations. But within a framework of progress towards this goal, the Secretary is directed and empowered within specified limits to accommodate foreign fishing, §§ 1801(c)(4); 1821. We find no congressional purpose that she disregard the benefits to be derived from cooperating with other nations. American consumers depend not only on United States producers; they benefit from our trade with the rest of the world. United States fishermen as well as consumers benefit from international cooperation. Indeed, the continued existence of fish stocks throughout the oceans of the world may well be dependent on actions by foreign nations as well as ourselves. Management of the oceans' fish resources cannot be accomplished solely within our own coastal areas. We think Congress did not require the Secretary to set optimum yield figures entirely without regard to the effects upon this country of allowing or denying foreign fishing.

On the other hand, Congress has expressly directed the Secretary to consider the overall welfare of the United States in setting the optimum yield figure. Our nation's welfare may be considered in terms of its foreign relations as well as its purely domestic needs, but the touchstone is the benefit of this nation, not that of some other. Moreover, by "particular reference

to the food supply", Congress underscored that priority was to be given to food requirements: the nation's fisheries were not, for example, to be swapped for a world banking agreement. The international considerations that are given weight must ordinarily relate to fishing, fish and other activities and products pertaining to the food supply (apart from any recreational benefits).

While we, therefore, conclude that the Secretary could consider the effect of international factors on this nation's welfare in setting an optimum yield figure, we are troubled by the lack of information in the record indicating what factors the Secretary considered in the instant case. The figure of 33,000 m.t. adopted by the Secretary was taken unaltered from the quota determined by ICNAF. The final plan stated:

> Since the US withdrew from ICNAF, the decisions made in that forum are no longer binding. However, the scientific assessments made in ICNAF are the bases of the PMP.

The record would indicate that more than the scientific assessments of ICNAF went into the plan. For example, the Secretary accepted the compromise figure for the United States catch set by the December ICNAF meeting, even though the bargaining over the figure had little to do with scientific judgment.

Before the draft plan had become final, several persons criticized the allotment to foreign fishermen as not justified by corresponding benefits to the United States. The point was made most directly in a comment letter from the National Coalition for Maine Conservation, Inc.:

> It is inaccurate and misleading to characterize ICNAF's determination of total allowable catch as a "determination of optimum yield", because optimum yield is a defined term in the Act and the considerations taken into account by ICNAF bear no relation to the considerations required by the Act to be taken into account in

determining optimum yield as defined therein.

The Department of Commerce responded:

> The [ICNAF total allowable catch] figures are determined by USA scientists working in cooperation with qualified scientists from other nations as part of a long-range program to maximize productivity from the resource given a set of management goals or options agreed upon. As such, the TAC should provide the greatest "overall benefit to the nation" as long as USA requirements (which are based on socio-economic considerations) are first satisfied.

After the plan was published in final form, representatives of Maine renewed the criticism. At the hearing held on April 19, Mr. William Gordon, the Regional Director for the National Marine Fisheries Service and a member of the American delegation to the December, 1976, ICNAF meeting, explained that the allocation to the Federal Republic of Germany was based on reciprocal economic benefits but that the balance of the foreign quota was intended only to accommodate those countries with historical fisheries in the area.

None of this evidence indicates by itself that the Secretary ignored her statutory duty to weigh benefits to the United States in allocating a portion of the 1977 herring catch to foreign fishermen. In adopting the ICNAF quotas, the Secretary may very well have observed international considerations not immediately apparent to the United States delegation. The Secretary certainly is in a much better position to observe interrelationships among particular international economic concessions that would lead to significant advantages for the nation. At the same time, these considerations are not apparent from the record, with the exception of the advantages obtainable from the Federal Republic of Germany allocation.

■ Where Congress has vested the authority to resolve technical questions of fact in a specialized administrative body with experience and expertise in that field, considerable deference is due its conclusions.

*Federal Power Commission v. Florida Power & Light*, 404 U.S. 453, 463, 92 S.Ct. 637, 30 L.Ed.2d 600 (1971). At the same time, the record must provide some basis for a reviewing court to determine that the agency has exercised its discretion consistently with standards set by Congress. *Camp v. Pitts*, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *First Bank and Trust Co. v. Smith*, 509 F.2d 663 (1st Cir. 1975). Judicial review cannot take place in a vacuum. *Cf. Camp v. Pitts, supra*, 411 U.S. at 142–43, 93 S.Ct. 1241; *Citizens to Preserve Overton Park v. Volpe, supra*, 401 U.S. at 420, 91 S.Ct. 814.

■ The foregoing leads us to this conclusion: while Maine has not at this time persuaded us that the Secretary's optimum yield figure is necessarily "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law", 5 U.S.C. § 706(2)(A), it has persuaded us that, in order to obtain the judicial review to which Maine is entitled, the Secretary must provide some "additional explanation of the reasons for the agency decision." *Camp v. Pitts, supra*, 411 U.S. at 143, 93 S.Ct. at 1244 (1973). There is sufficient indication of possible misunderstanding on the Secretary's part of the criteria applicable to the "optimum" yield figure to render it improper for a court merely to rely upon the presumptive correctness of the Secretary's bottom line result. We think the Secretary should be asked to supplement the record to provide an explanation of the basis of her optimum yield determination insofar as it exceeds amounts needed by United States fishermen and provides for less than the optimum rebuilding of the stock.

■ On the other hand, although the present record is inadequate, leading us to require the Secretary to address the deficiencies, it does not follow that Maine has as yet made a showing which will entitle it to receive equitable relief, in the form of an injunction against implementation of the preliminary management plan pending production of the Secretary's supplemental explanation. *Cf. Camp. v. Pitts, supra*, 411 U.S. at 143, 93 S.Ct. 1241. Because the foreign fishing season is hard upon us and of limited duration,[9] interference with implementation would come close to reversing the Secretary's decision. Having in mind both plaintiff's burden of proof and the broad implementation authority vested in the Secretary by Congress, we cannot at present say that it is unlikely that the Secretary can demonstrate a reasonable basis for the decision, or that it is likely that domestic fishermen will suffer irreversible harm from the plan. While the Act requires a determination reflecting substantive consideration, something not satisfied by resort to a conclusory verbal formula, the likelihood of the Secretary specifying relevant factors which would support a conclusion that setting the yield at this figure, which will allocate a portion of the Georges Bank herring catch to foreign fishermen, will serve "the greatest overall benefit to the Nation," would seem substantial. And both parties conceded that the present quota would probably permit some rebuilding of the stock, thereby increasing the resource available to domestic fishermen in the future.[10] In light of these considerations, we are constrained to let the present plan go forward at least until such time as the Secretary supplements the record and it can be ascertained whether or not the 33,000 m.t. figure is rationally supported. However, Maine is entitled to speedy supplementation of the present record, and to further review thereof in the district court, with all reasonable dispatch. Accordingly, in remanding we direct the district court to order forthwith that the Secretary specify and file in court within ten days from the

9. Under the restrictions laid down by the Secretary's plan, foreign vessels can fish the Georges Bank herring stock only between August 15 and September 30.

10. Dr. Anthony testified that a substantial portion of the present herring stock is seven years old, the age at which herring mortality increases dramatically. If these fish are not harvested this year, they may be lost forever to the world food supply.

date of the present judgment the reasons which led her to conclude that an optimum yield figure of 33,000 m.t., which allows foreign fishermen to take herring from a depleted stock, provides the greatest overall benefit to the Nation, with particular reference to food supplies and recreation, and including relevant economic, social or ecological factors.

*Remanded for proceedings in accordance herewith.*