**STATE OF MAINE et al., Plaintiffs, Appellants,**

v.

**Juanita M. KREPS et al., Defendants, Appellees.**

No. 77–1402.

United States Court of Appeals, First Circuit.

Argued Sept. 14, 1977.

Decided Sept. 23, 1977.

Rehearing Denied Oct. 20, 1977.

Edward F. Bradley, Jr., Asst. Atty. Gen., Augusta, Maine, for plaintiffs, appellants.

William Brian Morrison, Atty., Dept. of Justice, Washington, D. C., with whom James W. Moorman, Acting Asst. Atty. Gen., and Bruce C. Rashkow, Atty., Dept. of Justice, Washington, D. C., were on brief, for defendants, appellees.

Before COFFIN, Chief Judge, CAMP-BELL, Circuit Judge, WOLLENBERG, District Judge.*

LEVIN H. CAMPBELL, Circuit Judge.

This appeal by the State of Maine follows proceedings in the district court on remand from this court's decision in *Maine v. Kreps,* 563 F.2d 1043 (August 16, 1977). Maine continues her challenge to the 1977 herring quotas set by the Secretary of Commerce on the Georges Bank under the newly enacted Fishery Conservation and Management Act,

---

* Of the Northern District of California, sitting by designation.

16 U.S.C. §§ 1801 *et seq.* (the Act); and the question now before us is the adequacy of affidavits filed by the Secretary pursuant to this court's directions in the first *Kreps* decision. We required her to supplement the administrative record so as to reveal the basis for her determination of 33,000 metric tons (m.t.) as the 1977 optimum yield figure for the Georges Bank herring stock. The district court found the material in the affidavits sufficient to demonstrate a reasoned and legally adequate basis for the 33,000 m.t. figure which, as it exceeds estimated domestic fishing needs, has the effect of allowing foreign fishing fleets to fish on the Georges Bank during the present fishing season.

We held in our earlier *Kreps* opinion that the conservation and management aims of the Act do not necessarily preclude the selection of an optimum yield figure large enough to allow some foreign fishing where, as here, the figure is still conservative enough to allow rebuilding of a depleted stock at a reasonable if not optimum rate. But we emphasized that especially where the stock is below healthy levels, as is the case in the Georges Bank area, selection of a figure which allows leeway for any foreign fishing must reflect the Secretary's rational judgment that there is benefit to the Nation, with particular reference to its food supply. We said,

"Congress plainly did not intend the cardinal aim of the Act—the development of a United States' controlled fishing conservation and management program designed to prevent over-fishing and to rebuild depleted stocks—to be subordinated to the interests of foreign nations. But within a framework of progress towards this goal, the Secretary is directed and empowered within specified limits to accommodate foreign fishing, §§ 1801(c)(4); 1821. We find no congressional purpose that she disregard the benefits to be derived from cooperating with other nations. American consumers depend not only on United States producers; they benefit from our trade with the rest of the world. United States fishermen as well as consumers benefit from international cooperation. Indeed, the continued existence of fish stocks throughout the oceans of the world may well be dependent on actions by foreign nations as well as ourselves. Management of the oceans' fish resources cannot be accomplished solely within our own coastal areas. We think Congress did not require the Secretary to set optimum yield figures entirely without regard to the effects upon this country of allowing or denying foreign fishing.

"On the other hand, Congress has expressly directed the Secretary to consider the overall welfare of the United States in setting the optimum yield figure. Our nation's welfare may be considered in terms of its foreign relations as well as its purely domestic needs, but the touchstone is the benefit of this nation, not that of some other. Moreover, by "particular reference to the food supply", Congress underscored that priority was to be given to food requirements: the nation's fisheries were not, for example, to be swapped for a world banking agreement. The international considerations that are given weight must ordinarily relate to fishing, fish and other activities and products pertaining to the food supply (apart from any recreational benefits)." 563 F.2d at 1049–1050.

Because the record did not reveal whether the Secretary had balanced these considerations in setting the optimum yield figure, further explanation was required.

Of the three affidavits subsequently submitted by the Government, most important was that of David H. Wallace, Associate Administrator for Marine Resources of the National Oceanic and Atmospheric Administration and the official responsible for final action by the Department of Commerce on the Georges Bank herring preliminary management plan. Wallace stated that, in considering at what level to set the opti-

mum yield figure for this stock, he took into account the traditional fishing activities of foreign fleets in the Georges Bank herring fishery; substantial benefits to be derived by the United States from continued scientific research conducted by the foreign fleets; the need for the United States to retain a credible negotiating stance with regard to the ongoing Law of the Sea deliberations; past policy statements by the Government that the transition to United States management of the fishery resources within the 200 mile limit would be gradual; and the difficult position the United States would be in with regard to cooperative international fishery conservation efforts, its own distant-water fishing fleets, and foreign fishery trade, if it were to renounce commitments previously undertaken through the International Commission for the Northwest Atlantic Fisheries (ICNAF), from which the United States withdrew at the end of 1976. He observed:

> "It is my opinion that any abrupt termination of foreign fishing, given this historical background, could have had significant adverse impacts on our international fisheries relations."

Two other affidavits from Government officials involved in the development of the herring quota in essence repeated Wallace's explanation.

■ We are of the opinion that the explanation advanced by the Secretary for picking the figure chosen as an optimum yield provides a sufficient basis to determine that she did not act in an arbitrary or capricious manner or contrary to law, 5 U.S.C. § 706(2)(A), and we accordingly affirm the order of the district court dismissing the complaint.

■ The Secretary of Commerce, in the exercise of her conservation and management authority under the Act, has substantial discretion in selecting the appropriate quota for a given fishery. *See, e. g.,* S.Rep. No. 416, 94th Cong., 1st Sess. 25 (1975). A reviewing court may decide only whether this discretion was exercised rationally and consistently with the standards set by Congress, *Maine v. Kreps, supra,* slip opinion at 13, and may not substitute its own judgment as to values and priorities for that of the Secretary.

When this case was first presented to this court, the record was insufficient to determine whether the Secretary had so exercised her discretion, and some evidence suggested "that the Secretary may have uncritically taken ICNAF's total allowable catch figure . . . ." 563 F.2d at 1049. The representations of Wallace and the other officials now indicate that the ICNAF figure was only the starting point of analysis, and that the Government weighed the consequences of departure from the previously negotiated quota in light of its "historical background." These officials determined that repudiating the ICNAF guidelines would harm United States interests, particularly food supplies, and that adhering to them would benefit the Nation. In light of the scientific evidence at hand, the 33,000 m.t. figure appeared to allow some rebuilding of the stock [1] without exaggerating the consequences of the new American management of the herring stock to foreign fishermen who relied on the grounds. Having in mind that this is the first year since the United States has asserted jurisdiction over these offshore waters, we cannot say that the Secretary's rationale is arbitrary, capricious or contrary to the standards of the Act. 5 U.S.C. § 706(2)(A).

■ Maine argues that, if this court were to accept the "honoring commitments to other nations" explanation in this case, the Secretary would be provided with a loophole for circumventing the management goals of the Act whenever she chose. According to the state, the Secretary could use

---

1. Under the Secretary's optimum yield figure, a buildup of 13% was estimated. According to the Secretary's data, elimination of all foreign fishing from the area would further increase the rate of buildup of the presently depleted stock only by 5%.

any international agreement into which the executive branch enters as a shield for the quotas set, no matter how much the figures contravene the purposes of the Act. This argument seems to us to fall quite wide of the mark. The commitments made in this case were negotiated at least in part before Congress had passed the Act, and entirely before the Act took effect. The commitments and the Secretary's response to them reflect the special considerations of a transitional year and the inauguration of exclusive United States management of this fishery. Different considerations would apply to international agreements made at a different time under other circumstances.

 Maine also contends that because historical fishing patterns and past scientific cooperation are factors to be considered in allocating a fishery surplus once an optimum yield has been determined, 16 U.S.C. § 1821(e)(1), (2), they are impermissible criteria for setting the optimum yield. As a matter of statutory construction, Maine's argument is overstated: while Maine is right that determination of optimum yield rests on quite different premises from surplus allocation, there is no rule that the Secretary in determining the former must totally reject considerations that may be appropriate to both. The Government, furthermore, did not rely on the fact of historical fisheries per se, but only in relation to its prior commitments. Further, the scientific research to which Wallace referred was not that conducted in the past, but that expected in the future. These were not the same factors enumerated by Section 1821(e)(1), (2).

 Finally, Maine asserts that in providing an additional explanation the Government violated the notice and comment requirements of 16 U.S.C. § 1855(a). The provision referred to does not apply to the development of preliminary management plans, such as the one at issue here, and nothing in the Act suggests that such plans, in distinction to regulations attend-

ant thereto, are subject to notice and comment requirements. 16 U.S.C. § 1821(g). Further, the affidavits submitted to the district court did not constitute an amendment of any agency action, but only a supplemental explanation of why the agency acted as it did. The only rebuttal rights to which Maine was entitled were those provided by this court proceeding.

 Maine urges us to decide this case so as to clarify for the future the limits of the Secretary's authority in this area. To some degree we have done so: for example, in our clarification of the elements of the optimum yield standard. See *Kreps, supra.* The Secretary is now clear, if she was ever in doubt, that the broad grant of discretionary authority in the Act is tempered by the requirement that she comply with congressionally declared standards and objectives, and that her reasoning appear with sufficient clarity in the record for a court to review such compliance. But while the Secretary's discretion is not unbridled and is subject to review for arbitrariness and lack of compliance with statutory procedures and standards, Congress obviously intends her to retain the flexibility and freedom to deal effectively with different situations as they arise. This is a transitional year. What is reasonable now may be less so later. Moreover, the preliminary plan is subject to reevaluation in the preparation of succeeding plans. We have neither the authority nor the expertise to project future policies for the Secretary to follow.

*Affirmed.*