PACIFIC COAST FEDERATION OF
FISHERMEN'S ASSOCIATION,
INC. et al., Plaintiffs,

v.

SECRETARY OF COMMERCE et
al, Defendants.

No. C–80–1856–WAI.

United States District Court,
N. D. California.

June 4, 1980.

Steven M. Kipperman, Friedman, Shawn, Kipperman & Sloan, San Francisco, Cal., H. Michael Brucker, Oakland, Cal., for plaintiffs.

Donald A. Carr, Washington, D. C., argued, James M. Moorman, Bruce A. C. Rashkow, Dept. of Justice, Washington, D. C., for defendants.

Henry J. Sockbeson, Eureka, Cal., Bruce J. Friedman, California Indian Legal Services, Eureka, Cal., for intervenors Mable Hendrix, Walter J. Lara, Ethel Blake.

## MEMORANDUM OF DECISION

INGRAM, District Judge.

*Introduction*

In this suit, members of the salmon fishing industry challenge certain emergency interim regulations that restrict commercial and recreational salmon fishing off the coasts of Washington, Oregon, and California. These regulations, which took effect on June 1, 1980, were promulgated by the Secretary of Commerce, see 45 Fed.Reg. 29250 (1980), pursuant to the Fishery Conservation and Management Act of 1976, Pub.L.No. 94–265, 90 Stat. 331 (codified at 16 U.S.C. §§ 1801–1882) ("FCMA" or "the Act").

The Act provides for the establishment of the Pacific Fishery Management Council ("the Council") and directs the Council to draft periodic plans for the regulation of salmon fishing. In this case, the Council drew up the 1980 Pacific Salmon Fishery Management Plan ("the Plan"), which underlies the regulations under attack here. The Plan proposed, and the regulations require, a closure of ocean salmon fishing in California south of Cape Vizcaino from June 1 through June 30, and north of that point from June 1 through July 14.

Plaintiffs ask this Court either to enjoin the Secretary from enforcing the regulations pending the outcome of this suit or to expedite the trial of this matter so that final relief can be awarded at this time. The Court concludes that either approach would overstep the explicit bounds on its review function and therefore declines to grant the relief sought.

*Discussion*

Congress defined the standard of review in Section 305(d) of the Act, 16 U.S.C. § 1855(d):

"Regulations promulgated by the Secretary under this chapter shall be subject to judicial review to the extent authorized by, and in accordance with chapter 7 of Title 5 . . . except that (1) section 705 of such title is not applicable, and (2) the appropriate court shall only set aside any such regulation on a ground specified in section 706(2)(A), (B), (C), or (D) of such title."

5 U.S.C. § 706(2) provides in relevant part that the Court can:

" . . . hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitation, or short of statutory right; [or]

(D) without observance of procedure required by law."

By the terms of Section 305(d), these are the sole grounds upon which this Court can invalidate the Secretary's regulations. The Court's review function is restricted still further, however: (1) the Court can take only a limited look at the Plan underlying the Secretary's regulations; and (2) the Court lacks the power to award preliminary relief.

■ Judge Schwarzer correctly analyzed the extent to which the Act enables a court to examine the Plan:

"The Act appears to contemplate, however, that regulations to implement a fishery management plan may be promulgated only after the Secretary has found the plan to be consistent with the national standards under the Act and other applicable provisions of law. (§§ 1854(a) & (b), 1855(c)) Thus, the existence of a plan conforming to the statutory prerequisites is a condition to the Secretary's authority to promulgate regulations. This does not mean that the Court may make a *de novo* examination of the adequacy of the plan. The *Secretary's finding that the plan complies with the statute is binding on the Court unless it is arbitrary, capricious or an abuse of discretion.* (5 U.S.C. § 706(2)(A)) *Cf. Train v. Natural Resources Defense Council,* 421 U.S. 60, 75, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975); *ASARCO, Inc. v. Environmental Protection Agency,* 578 F.2d 319, 325–26 (D.C.Cir.1978); *American Meat Institute v. Environmental Protection Agency,* 526 F.2d 442, 450 (7th Cir. 1975). It does mean that the Court, in passing on the validity of the regulations, must review the plan to the extent necessary to determine whether the Secretary abused her discretion in making her finding."

*Washington Trollers Ass'n v. Kreps,* 466 F.Supp. 309, 312 (W.D.Wash.1979) (emphasis added).

The Court need decide only whether the Secretary could reasonably have concluded that the Plan was lawfully adopted by the Council; if so, the Court's inquiry is ended, regardless of whether a more detailed plan would be desirable.

The more important limit on the Court's power is Congress' statement that the Secretary's regulations "shall be subject to judicial review . . . except that . . . Section 705 of [Title 5] is not applicable." FCMA § 305(d), 16 U.S.C. § 1855(d). Section 705 provides in part:

"On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court . . . may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings."
5 U.S.C. § 705.

■ On its face, Section 305(d) precludes the grant of a preliminary injunction: it states that the provision of the Administrative Procedure Act authorizing a court to grant such relief is "not applicable". Judge Sharp took the section at face value when he denied preliminary relief in a suit challenging the 1978 regulations.

"I don't think that Congress felt federal courts were in the position to jump into these [FCMA cases] at this stage with its inherent injunctive power. Congress is in effect saying to the Federal courts look before you leap. Complete your judicial review before you take hasty action; and I think that's appropriate."

*Washington Trollers, supra,* at 4 (unreported decision cited in the government's opposition brief, filed May 21, 1980, at 25).

Plaintiffs attempt to avoid the force of Section 305(d): they suggest that the provisions of 28 U.S.C. §§ 1361 & 1851 invalidate that section; they contend that an amendment to 28 U.S.C. § 1331, eliminating the amount-in-controversy requirement, negates the effect of the section by affording a jurisdictional basis that allows for the grant of injunctive relief; and, they argue that if preliminary relief is barred, the Court can nonetheless expedite the trial of the issues here under Fed.R.Civ.P. 65(a)(2). These arguments are of no avail. The limitation of Section 305(d) is explicit. The Court cannot lightly assume its repeal or modification. Plaintiffs have nowhere shown that Congress intended to lessen the force of Section 305(d), either expressly or impliedly, by another enactment. Without such a showing, this Court is not prepared to act in a manner it believes that Congress has foreclosed. The Court also will not

consolidate the issues for trial at this time, even if it could properly do so. If the Court were to reach a final decision on the issues that plaintiffs contend are ripe for consolidation—the jurisdiction question, the validity of the emergency underlying the promulgation of the temporary regulations, and the contents of the Plan and the draft Environmental Impact Statement—it would essentially be making final rulings on the only matters of significance in this suit. It is precisely this kind of hasty review that Congress sought to prohibit in Section 305(d). The Court concludes that it would be unwise, if not improper, to grant relief that is "final" only in a nominal sense for the sole purpose of circumventing Section 305(d).[1]

Even if the Court could grant interim relief, it would have to deny such relief on the facts here. Plaintiffs argue that the Plan is invalid for failure to comply with the Act, and that this invalidity infects the Secretary's regulations, which are based on the Plan.

Plaintiffs focus their attack on the Plan's alleged failure to set forth the economic data required by Section 303(a)(3) of the Act. That section provides that the Council shall "assess and specify the present and probable future condition of, and the maximum sustainable yield and optimum yield from, the fishery, and include a summary of the information utilized in making such specification." 16 U.S.C. § 1853(a)(3).[2]

Plaintiffs proceed on two levels. They claim that the Council failed to consider the economic issues required by Section 303(a)(3), and that even if the Council did so, it failed to set forth the economic data

in the Plan. In effect, the plaintiffs argue that the Plan must include a detailed analysis of the fishing industry before any regulations can be adopted.

■ As discussed above, the Court can examine the Plan only to determine whether the Secretary could have reasonably concluded that the Plan was lawfully adopted by the Council. With respect to the question of economic data, the Court's role is only to determine whether the Secretary could have made a good faith finding that the Council fulfilled the mandate of Section 303(a)(3) from what appears in the Plan.

A review of the Plan shows that economic considerations were examined by the Council, and that numerous options were evaluated prior to reaching final recommendations. Discussing California chinook, the Council stated,

> "Meeting long-term spawning escapement goals for fall run chinook in the Klamath and Sacramento River systems, due to the depressed status of these stocks, is not practical in 1980. To do so would result in severe disruption of the California ocean fisheries and in some areas this possibly would necessitate total closures."

*Proposed Plan for Managing the 1980 Salmon Fisheries off the Coast of California, Oregon and Washington*, at 95 ("Plan").

Similarly, discussing Columbia River and Oregon coastal coho, the Council stated,

> "Due to the expected severe depression of these stocks in 1980, it is unlikely that escapements greater than that achieved in 1979 could be realized without severe disruption of the ocean fishery. There-

---

1. At oral argument plaintiffs suggested that the Court has the power to issue preliminary relief based upon an asserted violation of the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321–4347. Plaintiffs conceded that any NEPA violations are not expressly pleaded in the Complaint, but argued that they are pleaded properly by implication. If they are, they cannot in any event overcome the express limitation of Section 305(d).

2. The term "optimum yield" is defined in the Act:

> "The term 'optimum', with respect to the yield from a fishery, means the amount of fish—
>   (A) which will provide the greatest overall benefit to the Nation, with particular reference to food production and recreational opportunities; and
>   (B) which is prescribed as such on the basis of the maximum sustainable yield from such fishery, as modified by any relevant economic, social, or ecological factor." FCMA § 3(18), 16 U.S.C. § 1802(18).

fore the desired objective for 1980 is to achieve a total escapement of at least 270,000 adult coho to the Oregon Production Index area. This escapement level would be comparable to that achieved in 1979 and would provide for·an inside net fishery on the Columbia River and hatchery production needs. For natural stocks of Oregon coastal coho the above escapement objective represents significant improvement over the 1977 brood year levels and should prevent any declines in spawning ground counts over the improved levels experienced in 1979. This escapement objective is consistent with the long term goal of rebuilding natural runs of Oregon coastal coho to a level of 47 to 50 fish per mile (200,000 to 250,000 adult fish escapement)." *Id.* at 99.

The Draft Supplemental Environmental Impact Statement recognized that:

"[t]he more restrictive management options would create some additional adverse economic and social impacts on the commercial ocean troll fleet, the commercial passenger-carrying fleet and ocean recreational fishermen off the coasts of California, Oregon, and Washington. Some of the management options are less restrictive in certain areas than the 1979 regulations and result in some of the management goals not being met. To the extent this happens, the inside fisheries will experience adverse economic and social impacts." *Id.* at 125.

The more detailed EIS analysis concluded that:

"[t]he first issue is that a balance is needed between the needs of the resource and the economic and social health of the fisheries. Immediate achievement of the long-term goals would require such severe restriction on the existing ocean fisheries that economic chaos might result. This also could produce serious economic disruptions in coastal communities dependent on the salmon troll and/or recreational fisheries. Thus, options developed by the Salmon Plan Development Team reflect alternative levels of curtailed ocean fishing and rates of achiev-

ing long term goals. The regulations selected by the Council will reflect the extent to which they believe the ocean fisheries can be impacted in 1980 without unacceptable disruption of these fisheries. *A major problem in evaluating these options is that data on the past and existing economic structure of the ocean fisheries is even more deficient than the biological data. The difficulty of making a rational decision under these conditions can be understood better when it also is remembered that estimates of run sizes are not sufficiently accurate to estimate absolute harvest levels under any of the several regulatory options short of total closure."* *Id.* at 146 (emphasis added).

This review of the Plan and the Draft EIS alone casts great doubt on plaintiffs' argument. The Council clearly considered, analyzed, and recognized the economic impact of its recommendations. As stated in the Supplementary Information accompanying the regulations:

"The regulations published here are intended to prevent overfishing in the ocean fisheries and to minimize impacts on weaker stocks, while equitably apportioning the increased regulatory burden in the ocean and minimizing shifts in fishing effort along the coast." 45 Fed. Reg. at 29251.

Plaintiffs' stronger complaint is not that economic factors were ignored by the Council, but that they were slighted, or as plaintiffs would have it, given "short shrift". There is no question that the more rigorous data in the Plan does not address the economic questions. But this lack alone does not warrant a striking down of the plan.

The 1980 Plan amends the 1978 Plan: it modifies, and perforce incorporates, the earlier document. The discussion of optimum yield and maximum sustainable yield is fully set forth in the 1978 Plan. More important, the 1980 Plan is but one step in the long-range effort to meet the Act's requirements; it can be judged neither in isolation nor as the last word—it is not at all apparent that this type of interim document must set forth the data specified in Section

303(a)(3). Already the Council is assembling the type of data suggested by plaintiffs, and intends to include it in the comprehensive plan which hopefully will be prepared by the 1981 season.

Because the data emphasized by plaintiffs is not easily obtained, it cannot be too quickly assumed that Congress intended that it be included in the Plan. Plaintiffs concede that salmon fishing on the north coast is done largely by small, independent fishermen/entrepreneurs. Surely the kinds of predictions that plaintiffs claim should have been included in the Plan are not easily made. It is simply not realistic to expect the Council to quantify foreclosures, bankruptcies, fishing accidents, and unemployment rates. Nor could the Council have foreseen the wild gyrations in interest rates that have recently occurred. The Court believes that such in-depth forecasting is not fitted for an agency whose job is to weigh broad environmental and economic elements. The Council had no duty to consider the detailed factors suggested by plaintiffs.

This conclusion is reinforced by the Act's legislative history. In discussing Section 303(a)(3), the House Report states:

"The Plan could establish a system under which access to the fishery would be limited both as to foreign and domestic vessels and both as to recreational and commercial fishermen. If the system provided for limited entry, then *consideration* would be required to be given by the Council to such things as the present participation in the fishery concerned, historical fishing practices, values of existing investments in vessels and gear, capability of existing vessels to engage in other fisheries and the history of compliance with any fisheries regulations imposed pursuant to this Act."

*H.R.Rep. No. 445*, 94th Cong., 2d Sess. 66, *reprinted in* [1976–2] *U.S.Code Cong. & Admin. News*, pp. 593, 634–35 (emphasis added) (hereinafter "House Report").

Judge Schwarzer is in accord:

"The requirements of the Act are, however, phrased in general and open-ended language. The potential sweep of that language is such that one can hardly imagine a responsive description which cannot be criticized as omitting some item of information. This is particularly true of the salmon fishing industry, having in mind the magnitude of the subject, the elusiveness of the quarry and the incomplete state of knowledge about it. *Some of the information plaintiffs claim to be lacking, particularly economic and social data, simply does not exist or is not available, at least in the form sought.*" *Washington Trollers Ass'n v. Kreps, supra*, 466 F.Supp. at 313 (emphasis added). There is no reason to depart from this well-reasoned position. The statutory language must be reasonably construed. Congress could not have intended that the Council prepare an annual tome on the state of the salmon industry. Congress merely intended that the Council pay heed to the extent that its recommendations would affect those whose livelihood depends on fishing. In other words, the Council cannot thoughtlessly disregard those interests. But having considered the economic impact, the Council is free to adopt a plan. It need not undertake a rigorous exercise in microeconomic analysis.

In this case, the Council appears to have considered the economic impact of its Plan on the salmon fishing industry. At the least, and this is the crucial factor, it could have so appeared to the Secretary when he adopted his regulations. The Court concludes that it was not arbitrary, capricious or an abuse of discretion for the Secretary to have decided that the Council adopted a Plan that fulfilled the mandate of Section 303.

Plaintiffs argue that the Council misconceived its jurisdiction when it stated in the Plan that, "It is not under the Council's purview to set Indian harvest quotas." 1980 Plan, at 96. The Supplementary Information noted that, "The Council, in developing the 1980 amendments to the management measures in the FMP, gave extensive consideration to the impacts that various management options would have on the

rights of treaty Indian fisherman." 45 Fed. Reg. at 29251.

As commercial fishermen, plaintiffs have no direct interest in Indian affairs, but the Council's statement becomes significant to them when considered against the doctrine that regulatory action taken under an erroneous view of the law must be set aside. *See NLRB v. Brown*, 380 U.S. 278, 292, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965). Plaintiffs argue that the Plan and the regulations are invalid because the Council and the Secretary have failed to regulate Indian gill net fishing on the Klamath River.

Section 102 of the Act defines the Council's jurisdiction:

"The United States shall exercise exclusive fishery management authority, in the manner provided for in this chapter, over  .   .   .

(2) All anadromous species throughout the migratory range of each such species beyond the fishery conservation zone." FCMA § 102, 16 U.S.C. § 1812.[3]

█ Plaintiffs contend that Section 102 extends the Council's jurisdiction to inland fisheries used by the Indians. The legislative history lends some support to this view. As noted in the House Report:

"[T]here is also a sole Federal jurisdiction over the fisheries resources found beyond the three-mile territorial sea and within the present 12-mile limit to our fisheries economic zone. In these waters, it is the Federal Government which has the responsibility for whatever management of the fish stocks occur at all. Historically, however, the Federal role, in effect, has been limited to data gathering and law enforcement (principally against encroaching foreign fisherman). Many, in fact most of the fish stocks found within the 3 to 12-mile zone also spend part of their life histories within the coastal 3-mile area (and even inland in the case of anadromous species) and/or beyond the 12-mile limit. True management under these circumstances is awkward and inefficient at best and essentially nonexistent at worst."

*House Report, supra*, at 29, U.S.Code Cong. & Admin.News, 1976 at 601. While the breadth of this language would seem to bring Indian fisheries within the Secretary's and Council's jurisdiction, the Court must conclude that it does not do so. When the language is viewed in its historical context, and taking into account the special protections afforded to Indian interests, it becomes clear that Congress did not intend to extend the jurisdiction so far.

It cannot be doubted that the Indians have a right to fish on the reservation. Congress has carefully preserved this right over the years, and the courts have consistently enforced it. The Supreme Court has held that the creation of a reservation "for Indian purposes" encompasses the right to hunt and fish on that reservation.[4] *Menominee Tribe v. United States*, 391 U.S. 404, 405, 88 S.Ct. 705, 1707, 20 L.Ed.2d 697 (1968) ("The essence of the Treaty of Wolf River was that the Indians were authorized to maintain on the new lands ceded to them as a reservation their way of life which included hunting and fishing."). Similarly, the Court has decided that creation of an Indian Reservation implied the reservation of water rights for the Indians with respect to all waters on reservation lands. *See Arizona v. California*, 373 U.S. 546, 595–601, 83 S.Ct. 1468, 1495–1498, 10 L.Ed.2d 542

---

3. Salmon is an anadromous species.

4. On May 30, 1980, this Court granted the motion to intervene pursuant to Fed.R.Civ.P. 24(b)(2) made by three Yurok Indians who live on the Hoopa Valley Indian Reservation. Plaintiffs have challenged the legitimacy of Indian gill net fishing on the Klamath River and have argued that the Secretary is obligated to exercise controls over the Indian salmon catch. The intervenors have argued persuasively that if this Court granted the temporary relief plaintiffs seek, the Department of the Interior would unquestionably promulgate additional regulations to protect salmon stocks by limiting further the Indian catch. The intervenors contend that such controls would have detrimental effects on their cultural traditions, as well as cause substantial hardship from a reduction in food supplies. This Court recognizes that the Indian residents of the Reservation have a real and immediate interest in the outcome of this lawsuit.

(1963); *Winters v. United States*, 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1907).

The right to fish has been preserved in the case of the Yurok Reservation on the Klamath River. In *Mattz v. Arnett*, 412 U.S. 481, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973), the Court held that the Klamath River Indian Reservation had not been terminated by an 1892 statute, and that the lands remained "Indian Country" within the meaning of 18 U.S.C. § 1851. The Court emphasized that one of the reasons this land had been selected as a reservation site was the "the river, which ran through a canyon its entire length, abounded in salmon and other fish." *Id.* at 487, 93 S.Ct. at 2249. In the wake of the *Mattz* decision, the California courts have concluded that California has no power to regulate fishing by Indians on the Klamath River and that California statutory prohibitions on gill net fishing are inapplicable. *Arnett v. Five Gill Nets*, 48 Cal.App.3d 454, 121 Cal.Rptr. 906 (1975), *cert. denied*, 425 U.S. 907, 96 S.Ct. 1500, 47 L.Ed.2d 757 (1976).[5] When Congress ceded much of the control over the reservation to California, *see* 18 U.S.C. § 1162(a), it expressly stated that "[n]othing in this section . . . shall deprive any Indian . . . of any right, privilege, or immunity afforded under Federal treaty, agreement, or statute with respect to hunting, trapping, or fishing or the control, licensing, or regulation thereof." *Id.* § 1162(b).

Against this consistent pattern of concern for Indian fishing rights, plaintiffs suggest that Congress has infringed those rights by implication in Section 102. The Court cannot accept this argument, for it must always be presumed that Congress "intended to deal fairly with the Indians." *Arizona v.*

*California, supra*, 373 U.S. at 600, 83 S.Ct. at 1498. Although Congress may have the power to curtail the Indian's fishing rights, the abrogation of those rights cannot be accomplished in an oblique or casual manner.[6]

In this case, Congress has nowhere stated that it intended to interfere with Indian rights in the Klamath River area. The Court therefore concludes, as did Judge Schwarzer, that the Secretary does not have jurisdiction over the inland fisheries, and that "it was not unreasonable for her to approve a description [of the fishery] limited to the ocean salmon fishery under her jurisdiction." *Washington Trollers Ass'n v. Kreps, supra*, 466 F.Supp. at 313.

Plaintiffs' final contention is that "the Secretary has again conjured up an *emergency*" (Plaintiffs' Memorandum at 11 n.6, emphasis in original (filed May 13, 1980)), in order to avoid the notice-and-comment period set forth in Section 305(a) of the Act, 16 U.S.C. § 1855(a). The argument appears to rely on the fact that the regulations in 1977, 1978 and 1979 were promulgated on an emergency basis. Plaintiffs suggest that "the only 'emergency' has been and is that the Secretary improperly tolerated a lackadaisical attitude by the Pacific Regional Council [PFMC] that seems never to allow for 45 + day public comment to the Secretary." Plaintiffs' Memorandum at 11 n.6.

The Court cannot presume bad faith on the part of the Council or the Secretary. The emergency conditions prevalent in previous years are not at issue. The only question is whether the Secretary has made a reasonable finding that an emergency involving the salmon fishery resource exists. *See* FCMA § 305(e), 16 U.S.C. § 1855(e).

---

5. The Secretary of the Interior, through the Bureau of Indian Affairs, has issued regulations governing salmon fishing by the Indians on the Hoopa Valley Indian Reservation. *See* 25 C.F.R. § 258 *et seq.*

6. In *Choate v. Trapp*, 224 U.S. 665, 32 S.Ct. 565, 56 L.Ed. 941 (1912), the Supreme Court stated unequivocally that "no right which was actually conferred on the Indians can be arbitrarily abrogated by statute." *Id.* at 674, 32 S.Ct. at 569. The Court emphasized that stat-

utes involving the Indians should be construed in their favor.

"The construction, instead of being strict, is liberal; doubtful expressions, instead of being resolved in favor of the United States, are to be resolved in favor of a weak and defenseless people, who are wards of the nation, and dependent wholly upon its protection and good faith. This rule of construction has been recognized, without exception, for more than a hundred years." *Id.* at 675, 32 S.Ct. at 569.

In the Supplementary Information accompanying the regulations, the Secretary has stated,

"Recognizing the critical needs for reductions in the ocean harvests of these salmon stocks, the Assistant Administrator has determined that an emergency exists and that emergency promulgation of these regulations under the provisions of sec. 305(e) of the FCMA is required to meet this emergency."

45 Fed.Reg. at 29252.

While the plaintiffs contest the validity of the scientific data concerning the extent of salmon stocks, the Court should not substitute its judgment for that of the agency. The Court cannot say that there is no rational basis for the scientific conclusion reached by the Council. For that reason, the Court must affirm the Council's assessment of the "state of the salmon." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974); *Maine v. Kreps*, 563 F.2d 1043, 1050 (1st Cir. 1977) ("Where Congress has vested the authority to resolve technical questions of fact in a specialized administrative body with experience and expertise in that field, considerable deference is due its conclusions."). Certainly plaintiffs' submission of one affidavit of a scientist contesting the validity of the Council's scientific findings is not an adequate basis for this Court to reject the Council's findings.

The Government has rebutted successfully any charges that it has fabricated emergency conditions or otherwise delayed unnecessarily in promulgating these regulations. The Council's proposed options for 1980 and draft environmental impact statement were issued to the public for review in January 1980. Re-evaluations of the salmon stock were made in March 1980. The proposed amendments to the Plan were submitted by the Council to the Secretary on March 29, 1980. The 60-day review period outlined in Section 304(a), 16 U.S.C. § 1854(a), was reduced to 23 days. The amendments were approved by the Secretary on April 24, 1980, and the emergency regulations were published in the Federal Register on May 1, 1980.

No evidence of dilatory behavior is before the Court. Instead, the Court must conclude that the Council proceeded at a judicious pace in its efforts to prepare reliable data concerning a changing environment. From the information presented to him by the Council reflecting the poor state of salmon stocks, the Secretary could have reasonably concluded that promulgation of regulations on an emergency basis was essential to prevent the imminent overfishing of ocean salmon.

*Conclusion*

To conclude, the Court cannot award plaintiffs the relief they now seek. The Act expressly forbids the judiciary from granting preliminary relief. Congress has given the Court a minor role in these events: the Court is told to correct the large errors, and to do so only after a full and careful analysis. Beyond this, the Court can do nothing. Such a role does not lend itself to the type of relief plaintiffs seek here.

Even if the Court were able to reach the merits at this preliminary stage, it would have to deny relief under the standards embodied in the Act. The Secretary did not act in a manner that was arbitrary, capricious or an abuse of discretion in concluding that the Council had prepared and submitted to him a 1980 salmon management plan in accordance with the Act. From the information available to him, the Secretary reasonably concluded that emergency regulations were essential to protect the diminishing salmon resources.

The Secretary relied on a Plan that was based on the best data available under the circumstances. The kind of economic data that plaintiffs contend should have been included in the Plan "simply does not exist or is not available, at least in the form sought." *Washington Trollers Ass'n v. Kreps, supra*, 466 F.Supp. at 313. The Council is currently preparing its comprehensive plan for the salmon fishery, and plaintiffs will have the opportunity to work with the Council and to assist it in compil-

ing and analyzing the economic and scientific data called for by the Act. Plaintiffs cannot rightfully object on the ground that these temporary regulations do not contain an exhaustive economic analysis.

The Court must consider compliance with the Act from this perspective. Plaintiffs cannot reasonably have expected the Secretary to do any more than he did; that is, to make a good faith effort to gather and use the available information. As the Fourth Circuit held in reviewing a similar challenge:

> "While EPA must take seriously its statutory duty to consider cost, courts of review should be mindful of the many problems inherent in an undertaking of this nature and uphold a reasonable effort made by the Agency. This requirement should not serve as a dilatory device, obstructing the Agency from proceeding with its primary mission."[7]
>
> *FMC Corp. v. Train,* 539 F.2d 973, 979 (4th Cir. 1976).

Just as the agency must act reasonably in regulating the business of fishermen, so the Court must be sensible in its review, being careful not to hinder the agency's legitimate role with an overemphasis on technicalities.

In this case, the Secretary and the Council have made a good faith effort to fulfill the mandate of the Act. They have examined the options and reached a reasoned conclusion. This is all the Act requires.

The Court recognizes that its failure to grant immediate relief to plaintiffs will necessarily result in real and substantial hardship to the individual plaintiffs and to other individuals and enterprises who rely largely on salmon fishing and processing for their livelihood. Much of the 1980 salmon season has been rendered useless by the Secretary's decision. It will admittedly be of little comfort to these people to be told that their suffering will further a greater and more lasting good; the person trying to pay his bills today cannot look to the 1985 salmon harvest for solace and relief. The nation as a whole is experiencing substantial economic difficulties, and northern California in particular has been hard hit. But as much as the Court may sympathize with the plaintiffs, it has no choice but to follow the dictates of the law, and for that it must look to what Congress has said in the Act.

From the evidence before it and the applicable legal mandates, the Court must deny plaintiffs' request for relief *pendente lite* or for a writ of mandamus.

---

7. The Act reflects concern for the viability both of fish and the fishing industry. However, it is apparent that overfishing of species was a primary impetus to passage of the Act. The House Report stated:

> "After several years of painstaking fact-finding and deliberation, the Committee has concluded that many of the important American fish stocks have been over-exploited, some, like haddock, to the point of essentially commercial extinction, and many others are threatened with a similar fate. The Committee concludes that the depletion of these stocks is in large measure attributable to the phenomenal increase in recent years in the number of technologically sophisticated and very efficient foreign fishing vessels in waters off United States coasts, and that if such fishing pressure is not regulated and reduced immediately, irreversible damage may well be done to important fish stocks and to American fishing interests alike. While gladly conceding that an inevitable goal must be reform and increased sophistication in international law and other appurtenances of international agreement, the Committee is resolute in its conviction that the time required to effect needed adjustments in the arena of international law are such as to make the conservation of many fish stocks and the welfare of our domestic fishing industry almost moot unless immediate, or at least short-term, action is taken without further delay." *House Report, supra,* at 43–44, U.S.Code Cong. & Admin.News 1976 at 611. This passage makes clear that the health of the fishing industry depends on immediate efforts to help propagate species threatened by overfishing.