Pietro **PARRAVANO**, Wayne Heikkila, Marguerite Dodgin, Earl Carpenter, David Bitts, Liz Henry, Norman L. de Vall, Pacific Coast Federation of Fishermens' Associations, Humboldt Fishermens' Marketing Association, Caito Fisheries, Inc., Golden Gate Fishermens' Association, and Salmon Trollers Marketing Association, Plaintiffs,

v.

Bruce **BABBITT**, as Secretary of the United States Department of the Interior, and in his individual capacity; Ron Brown, as Secretary of the United States Department of Commerce, and in his individual capacity, Defendants.

No. C 93–2003 TEH.

United States District Court, N.D. California.

July 29, 1994.

James M. Johnson, Olympia, WA, Mary L. Hudson, Gorman & Waltner, Oakland, CA, for plaintiffs.

James C. Kilbourne, Jean E. Williams, U.S. Dept. of Justice, Environment and Natural Resource Div., Washington, DC, for defendants.

Barbara E. Karshmer, George Forman, Patricia A. Prochaska, John R. Shordike, Alexander & Karshmer, Berkeley, CA, for intervenor.

## ORDER

THELTON E. HENDERSON, Chief Judge.

This matter came before the Court on April 25, 1994 on defendants' Motion to Strike or to File a Supplemental Opposition to *Amicus* Memoranda, plaintiffs' Motion for Partial Summary Judgment, plaintiffs' Motion to Strike Extraneous Matters, and defendants' Motion to Dismiss. After careful consideration of the parties' oral and written arguments and the record herein, the Court grants defendants' motions to file a supplemental opposition and to dismiss, and denies plaintiffs' motions to strike and for partial summary judgment.

*FACTUAL BACKGROUND:*

The focal point of this action is the popular Klamath River fall chinook salmon. These anadromous fish spawn in the Klamath River and its upper tributaries, migrate downstream to the ocean, and then return to their fresh water origins at age three or four to spawn and then die. An unfortunate combination of overfishing, prolonged drought, and habitat degradation have led to significantly depressed levels of Klamath chinook stock, to the detriment of commercial fishing interests, sport fishermen, and the Native American tribes who rely on these fish for subsistence and ceremonial needs. *See, United States v. Eberhardt,* 789 F.2d 1354, 1363 (9th Cir.1986) (conc. opin.) (overfishing has depleted the stocks of Klamath River fish). The conflicts inherent in having a chinook population too small to satisfy the needs of all who have a stake in the Klamath salmon are what underlie this case.

Plaintiffs are commercial fishermen and commercial fishing associations [1] who contend that the Secretary of Commerce ("Secretary Brown") improperly reduced the Klamath chinook ocean harvest rate for the 1993 fall fishing season. They contend that Secretary Brown's actions violate the Magnuson Fishery Conservation and Management Act ("Magnuson Act"), 16 U.S.C. § 1801 *et seq.,* the Administrative Procedures Act ("APA"), 5 U.S.C. § 551 *et seq.,* 42 U.S.C. § 1981 and the United States Constitution, the Freedom of Information Act ("FOIA"), 5 U.S.C. §§ 552b, the Klamath River Basin Act, PL 99–552, and the Trinity Basin Act, PL 98–541.

In a motion filed on July 16, 1993, plaintiffs sought partial summary judgment on plaintiffs' claims that defendants had violated procedural and substantive requirements of the Magnuson Act (plaintiffs' first cause of action) and that defendants' actions in setting the 1993 season were also in violation of the APA (plaintiffs' second cause of action). Defendants cross-moved for a partial summary judgment affirming their actions in setting

---

1. In addition to seven individual plaintiffs, there are five organizational plaintiffs: Pacific Coast Federation of Fishermen's Associations, Humboldt Fishermen's Marketing Association, Caito Fisheries, Inc., Golden Gate Fishermen's Association, and the Salmon Trollers Marketing Association.

the 1993 season. In a preliminary order issued on August 12, 1993, and a detailed order issued on November 3, 1993, 837 F.Supp. 1034, the Court granted summary judgment to defendants except with regard to defendants' decision to increase the spawning escapement floor for Klamath River salmon by 3,000 fish.[2] The Court also granted summary judgment to defendants on plaintiffs' second motion for partial summary judgment, concerning plaintiffs' FOIA claim (plaintiffs' fifth cause of action).

Plaintiffs now seek a partial summary judgment on plaintiffs' remaining claims brought under the Magnuson Act. Plaintiffs seek a summary judgment that there is no federal law reserving fishing rights to the Hoopa Valley and Yurok Indians which must be considered applicable law by Secretary Brown in regulating ocean fisheries under the Magnuson Act, since ocean harvesting by plaintiffs may only be restricted to protect Indian fishing rights established by treaties.[3] Intervenor Sue Masten joined in defendants' opposition to plaintiffs' motion for partial summary judgment on this basis. Plaintiffs also submit in support of their motion for summary judgment the argument that Magnuson Act procedures and National Standards have been violated by defendants' "agreement" to "regulate all ocean seasons in accordance with the Interior Solicitor's opinion." On March 8 and March 14, 1994, respectively, the Humboldt Bay Harbor, Recreation and Conservation District of the State of California, and the State of California, filed briefs as *amicus curiae* in support of plaintiffs' motion for summary judgment.[4]

Defendants cross-move to dismiss (1) plaintiffs' allegation that the Secretary of the Interior ("Secretary Babbitt") violated constitutional equal protection and due process guarantees as well as 42 U.S.C. § 1981 in setting the 1993 Indian harvest allocation because such allocation was racially based and discriminatory, and (2) plaintiffs' allegation that Secretary Babbitt violated certain acts relating to the restoration of the Klamath and Trinity Rivers. Plaintiffs move to strike several documents that defendants filed with their motion to dismiss. We first address plaintiffs' motion for summary judgment, below.

*LEGAL STANDARD:*

*Defendants' Motion to Dismiss*

■■■ Dismissal is appropriate under Rule 12(b)(6) when a plaintiff's complaint fails to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). The Court must accept as true the factual allegations of the complaint and indulge all reasonable inferences to be drawn from them, construing the complaint in the light most favorable to the plaintiff. *Dodd v. Spokane County,* 393 F.2d 330, 334 (9th Cir.1968); *NL Industries, Inc. v. Kaplan,* 792 F.2d 896, 898 (9th Cir. 1986). Unless the Court converts the Rule 12(b)(6) motion into a summary judgment motion, the court may not consider material outside of the complaint. *Powe v. Chicago,* 664 F.2d 639, 642 (7th Cir.1981). The Court must construe the complaint liberally, and dismissal should not be granted unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Wright

---

**2.** In the August 12, 1994 Order, the Court remanded the issue of the increase of the spawning escapement floor to the Secretary of Commerce so he could supplement the Administrative Record. On August 19, 1993, defendants made a submission to this Court in accordance with this Order. Now, eight months later, plaintiffs state that they intend to submit "comments" on the issue. At this point, the issues regarding whether the Secretary of Commerce properly increased minimum spawning escapement in 1993 are moot. Therefore, the Court declines to give plaintiffs an extension of time to respond.

**3.** In the Court's February 1, 1994 Order, we stated that "the *only* issue the Court will consider, in connection with plaintiffs' Motion for Par-

tial Summary Judgment, is whether the Klamath River tribes possess federally reserved rights, such that ocean harvesting may be curtailed by the government to protect such rights under the Magnuson Act. The Court will *not* address, or allow adjudication of, any issue concerning the allocation, amount, or extent of, such rights with respect to any Tribe or plaintiff."

**4.** Defendants move to strike or to file a supplemental opposition to the amicus briefs, because the briefs were filed after defendants filed their opposition to plaintiffs' motion for summary judgment. At oral argument, the Court granted defendants' motion to submit an opposition to the amicus briefs.

and Miller, *supra*, § 1350; *Intake Water Co. v. Yellowstone River Compact Com.*, 769 F.2d 568, 569 (9th Cir.1985).

*Plaintiffs' Motion for Summary Judgment*

 Summary judgment is appropriate when there is no genuine dispute as to material facts and the moving party is entitled to judgment as a matter of law. *Jung v. FMC Corp.*, 755 F.2d 708, 710 (9th Cir.1985); Fed. R.Civ.P. 56. Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.* The court may not weigh the evidence, and is required to view the evidence in the light most favorable to the nonmoving party. *Id.*

*DISCUSSION:*

## I. PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

### 1). *Background.*

The areas that are the Yurok and Hoopa Valley Reservations today were originally set aside in the nineteenth century. The Act of March 3, 1853, authorized the President to "make ... reservations ... in the State of California ... for Indian purposes." 10 Stat. 226, 238. In 1855, by executive order and under authority of the Act of March 3, 1853, President Pierce established the Klamath River Reservation along the lower 20 miles of the Klamath River. I.C. Kappler, *Indian Affairs: Laws and Treaties* 816 (1904) ("Kappler"). The lands were mostly occupied by Yurok Indians, and the reservation encompassed what is today the lower portion of the Yurok Reservation. According to the Supreme Court in *Mattz v. Arnett*, 412 U.S. 481, 486, 93 S.Ct. 2245, 2248, 37 L.Ed.2d 92 (1973), the site was ideally selected for the Yuroks. They had lived in the area; the arable land, although limited, was "peculiarly adapted to the growth of vegetables," 1856 Report 238, and the river, which ran through a canyon its entire length, abounded in salmon and other fish. *Kappler* at 817.

The original Hoopa Valley Reservation, a 12 mile square on either side of the Trinity River, was first located and proclaimed in 1864, by the Superintendent of Indian Affairs for California, pursuant to legislation enacted that year. The legislation authorized the President to set apart up to four tracts of land in California "for the purposes of Indian reservations, which shall be of suitable extent for the accommodation of the Indians of said state, and shall be located as remote from white settlements as may be found practicable, having due regard to their adaptation to the purposes for which they are intended." Act of April 8, 1864, § 2, 13 Stat. 39, 40 ("1864 Act"); *see also* Kappler at 815; *Donnelly v. United States*, 228 U.S. 243, 255–57, 33 S.Ct. 449, 452–53, 57 L.Ed. 820, *modified on other grounds and rehearing denied*, 228 U.S. 708, 33 S.Ct. 1024, 57 L.Ed. 1035 (1913); *Mattz v. Superior Court*, 46 Cal.3d 355, 250 Cal.Rptr. 278, 282, 758 P.2d 606, 610 (1988). The reservation was mostly inhabited by Hoopa Indians. In 1876 President Grant formally set aside the reservation by Executive Order "for Indian purposes, as one of the Indian reservations authorized ... by Act of Congress approved April 8, 1864." *Kappler*, at 815.

In 1891, President Harrison issued an Executive Order extending the Hoopa Valley Reservation along the Klamath River from the mouth of the Trinity River to the Pacific Ocean, thereby encompassing and including the Hoopa Valley Reservation, the original Klamath River Reservation, and the connecting strip in between. *See Mattz v. Arnett*, 412 U.S. at 492–493, 93 S.Ct. at 2251–52.

In 1988 Congress enacted the Hoopa–Yurok Settlement Act of 1988 ("HYSA"), 25 U.S.C. § 1300i–1300i–11. The HYSA partitioned the extended Hoopa Valley Reservation into the present Hoopa Valley Reservation and the Yurok Reservation. The congressional partition "recognized and established" two distinct reservations for the Yurok and Hoopa Valley Tribes ("the Tribes"), and declared that "[t]he unallotted trust land and assets" of each reservation would thereafter be held in trust by the United States

for the benefit of the Hoopa Valley and Yurok Tribes, respectively. 25 U.S.C. § 1300i–1(b) & (c). The legislative history accompanying the HYSA indicates that tribal fishing rights constituted one such recognized asset:

> The legislation will also establish and confirm the property interests of the Yurok Tribe in the Extension, including its interest in the fishery, enabling the Tribe to organize and assume governing authority in the Extension.

See *Partitioning Certain Reservation Lands Between the Hoopa Valley Tribe and the Yurok Indians,* S.Rep. No. 564, 100th Cong., 2d Sess. 2–9 (1988) and *Partitioning Certain Reservation Lands Between the Hoopa Valley Tribe and the Yurok Indians,* H.Rep. No. 938, pt. 1, 100th Cong., 2d Sess. 8–15 (1988).

The Tribes have historically been dependent on salmon fishery of the Klamath River. One estimate is that prior to settlement along the coast by non-Indians, the Indians in the Klamath River drainage "consumed in excess of 2 million pounds ... of salmon annually from runs estimated to have exceeded 500,000 fish." U.S. Department of the Interior, *Environmental Impact Statement—Indian Fishing Regulations* 2 (Hoopa Valley Reservation, California (April 1985)). As the Court noted in *Blake v. Arnett,* 663 F.2d 906, 909 (9th Cir.1981), the fishery was "not much less necessary to the existence of the Indians than the atmosphere they breathed." *See also Mattz v. Arnett,* 412 U.S. at 487, 93 S.Ct. at 2249.

At the time the Hoopa Valley and Klamath River Reservations were created, the United States was well aware of the Indians' dependence upon the fishery. A specific, primary purpose for establishing the reservations was to secure to the Indians the access and right to fish without interference from others. *See Mattz v. Arnett,* 412 U.S. at 487–88, 93 S.Ct. at 2249 (Klamath River Reservation ideal for the Indians because of the river's abundance of salmon and other fish); *Donnelly v. United States,* 228 U.S. at 259, 33 S.Ct. at 453; *United States v. Eberhardt,* 789 F.2d at 1360 (citing *People v. McCovey,* 36 Cal.3d 517, 534, 205 Cal.Rptr. 643, 653, 685 P.2d 687, 697 (1984), *cert. denied California v. McCovey,*

469 U.S. 1062, 105 S.Ct. 544, 83 L.Ed.2d 432 (1984)); *United States v. Wilson,* 611 F.Supp. 813, 817–818 and n. 5 (N.D.Cal.1985) (Hoopa Valley Reservation Indian fishing rights were granted by Congress when it authorized President to create reservations for Indian purposes). *Mattz v. Superior Court,* 46 Cal.3d 355, 250 Cal.Rptr. 278, 290, 758 P.2d 606, 618 (river and Indian fishing played a primary role in the 1891 extension of the Hoopa Valley Reservation to include the old Klamath Reservation and connecting strip).

■ The power of the United States to reserve fishing rights for Indians and Indian tribes is derived from its plenary power over Indian affairs, grounded in the Indian Commerce Clause and the Interstate Commerce Clause. U.S. Const. Art. I Sec. 8; *see Montana v. Blackfeet Tribe of Indians,* 471 U.S. 759, 764, 105 S.Ct. 2399, 2402, 85 L.Ed.2d 753 (1985) ("Constitution vests the Federal Government with exclusive authority over relations with Indian tribes.").

The Indians' reliance on fishing continues to this day. As the court noted in *United States v. Wilson,*

> To modern Indians of the Hoopa Valley Reservation, fishing remains a way of life, not only consistent with traditional Indian customs, but also as an eminently practical means of survival in an area which lacks the broad industrial or commercial base which is required to provide its population, Indian or otherwise, with predictable, full-time employment and income adequate to provide sufficient quantities and qualities of the necessities of life.

611 F.Supp. at 818 n. 5 (citations omitted).

On October 4, 1993, the Solicitor of the Department of the Interior issued an Opinion concluding that the fishing rights reserved when the reservations were created entitle the Tribes to a share of fishery resources sufficient to support their moderate living needs, but no more than 50% of the harvestable share, unless varied by agreement of the parties. Subsequently, on December 23, 1993, the Secretary of Commerce published an interpretative rule, which states that the Secretary recognizes that the Federally re-

served fishing rights of the Yurok and Hoopa Valley Tribes, as construed in the Solicitor's Opinion, are applicable law for the purposes of the Magnuson Act. 58 Fed.Reg. 68063 (December 23, 1993). The Federal Register notice states that all future fishery management measures for the ocean salmon fisheries off Washington, Oregon and California must provide for harvest allocations as provided for in the Solicitor's Opinion:

> The [fishery management plan (FMP)] specifies that, to the maximum extent possible, optimum yield will be set at a level that fulfills the requirements of the Indian fishery for salmon on the Klamath River and that the Council must take the effects of in-river harvest on spawner escapement into account while setting ocean harvest levels. . . . The Solicitor's Opinion now provides a clear legal framework for allocating the salmon harvest between the Tribes and various other in-river and ocean commercial and recreational fishermen. . . . The Secretary will only approve ocean salmon management measures recommended by the Council that provide for tribal harvest opportunity consistent with the rights recognized in the Solicitor's Opinion and meet the spawning escapement goal for Klamath River fall chinook salmon.

58 Fed.Reg. 68063.

The rule amends the Appendix to 50 CFR Part 661, which is the framework amendment for annual management measures by including therein direction to consider as applicable law the construction of the rights provided in the Solicitor's Opinion. This amendment applied to the 1994 management measures developed by the Pacific Fishery Management Council. On January 3, 1994, the Assistant Secretary, Indian Affairs, formally instructed the Sacramento Area Director, Bureau of Indian Affairs, to implement the Solicitor's Opinion in regulating the on-reservation tribal fishery beginning in 1994.

2). *Applicable Law*

*Standard of Review*

Plaintiffs challenge Commerce's action in applying, as "applicable law" under the Magnuson Act, the construction of law set forth in the Solicitor's Opinion. Enacted in 1976, the Magnuson Act was intended to respond to overfishing and inadequate conservation measures which were threatening future commercial and recreational fishing, as well as the very survival of species. 16 U.S.C. § 1801(a); *Lovgren v. Byrne*, 787 F.2d 857, 861 (3rd Cir.1986) (Magnuson Act "was enacted at a time when overfishing of coastal waters was commonplace, threatening the existence of a number of species of fish"); *Pacific Coast Federation of Fisherman's Assoc. v. Secretary of Commerce*, 494 F.Supp. 626 at 635, n. 7 (N.D.Cal.1980) ("over-fishing of species was a primary impetus to passage of the Act").

The Act provides for the establishment of regional Councils which are charged with developing, after public comment, a recommended fishery management plan ("FMP") for regulating fishing in the EEZ. 16 U.S.C. § 1852. The Councils also recommend seasonal adjustments and amendments to the FMP. *Id.* The Council's recommendations are submitted to the Secretary of Commerce who reviews them for consistency with seven "National Standards" set forth in the Act and "other applicable law." Based on this review, the Secretary may either approve or disapprove the Council's recommendations. 16 U.S.C. § 1854; *Eberhardt*, 789 F.2d 1354 at 1363 (Councils "recommend" ocean fishing regulations to the Department of Commerce).

■ An action taken by the Secretary of Commerce under the Magnuson Act is subject to limited judicial review, 16 U.S.C. § 1855(b), and may only be invalidated if the challenged action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1982). We review legal questions under a *de novo* standard. We also note that the Department of the Interior has been given authority under 25 U.S.C. §§ 2 and 9 to manage and conserve Indian resources, and we must assume that the Department has been given reasonable power to effectively discharge its broad responsibilities for the management of Indian affairs. *United States v. Eberhardt*, 789 F.2d at 1354; *Udall v. Littell*, 366 F.2d 668, 672 (D.C.Cir.1966).

*3). Discussion*

*Fishing Rights of the Tribes*

Plaintiffs first move for partial summary judgment that there is no federal law reserving fishing rights to the Hoopa Valley and Yurok Indians which must be considered applicable law by the Secretary of Commerce in regulating ocean fisheries, since ocean harvesting by plaintiffs may only be restricted pursuant to treaty-based Indian fishing rights. Plaintiffs essentially make three different arguments: (1) that the Hoopa Valley and Yurok Tribes have no federally reserved fishing rights; (2) that fishing rights secured by executive or statutory authority do not command the same authority as rights secured by treaty; and (3) that there can be no off-reservation regulation pursuant to an on-reservation fishing right. The Court will address these arguments in turn.

*(i) Federally Reserved Fishing Rights*

■ Plaintiffs first argue that the Hoopa Valley and Yurok Indians have no fishing rights because the establishment of their reservations did not "create any fishing rights at all." However, while the Hoopa Valley and Yurok Indians do not have any treaty based fishing rights, courts have consistently recognized that the federal government reserved Indian fishing rights when it established what are the Hoopa Valley and Yurok Reservations of today.

The Ninth Circuit held in *United States v. Eberhardt* that the Yurok and Hoopa Valley Indians have reserved fishing rights:

The right to take fish from the Klamath River was reserved to the Indians when the reservation was created.... [T]he right reserved includes fishing for ceremonial, subsistence and commercial purposes.

789 F.2d at 1359.

In *People v. McCovey*, the Supreme Court of California held that "[Indian fishing]

rights were granted by Congress when it authorized the President to create the reservation for Indian purposes." 205 Cal.Rptr. at 653, 685 P.2d at 697. Further, the Northern District of California has previously confirmed the Yurok and Hoopa Valley Indians' right to fish:

It cannot be doubted that the Indians have a right to fish on the reservation. Congress has carefully preserved this right over the years, and he Courts have consistently enforced it. The Supreme Court has held that the creation of a reservation "for Indian purposes" encompasses the right to hunt and fish on that reservation. [citing *Menominee Tribe of Indians v. U.S.*, 391 U.S. 404, 405, 88 S.Ct. 1705, 1707, 20 L.Ed.2d 697 (1968) ].

*Pacific Coast Federation of Fishermen's Asso. v. Secretary of Commerce*, 494 F.Supp. 626, 632 (N.D.Cal.1980). *See also, Mattz v. Superior Court*, 46 Cal.3d 355, 250 Cal.Rptr. 278, 758 P.2d 606 (1988) (right to take fish from the Klamath River was reserved for the Indians when the reservation was created); *Arnett v. Five Gill Nets*, 48 Cal.App.3d 454, 121 Cal.Rptr. 906 (1975); *cert. denied*, 425 U.S. 907, 96 S.Ct. 1500, 47 L.Ed.2d 757 (1976) (same); *Donahue v. California Justice Court*, 15 Cal.App.3d 557, 93 Cal.Rptr. 310 (1971) (same).[5]

■ Plaintiffs also contend that, even if there are fishing rights, they were not vested "in any particular tribe" when the reservations were set aside in the 19th century. While this is true, this was altered by the HYSA, which specifically vested fishing rights in the Yurok and Hoopa Valley Tribe in 1988. Pursuant to this law, the Yurok and Hoopa Valley Tribes have a federally reserved fishing right which includes fishing for ceremonial, subsistence and commercial

---

**5.** Plaintiffs ignore these cases except *Eberhardt*, which they characterize as upholding an Interior regulation prohibiting Indian fishing for commercial purposes because the fishing rights involved were not treaty rights. However, *Eberhardt* does not concern the issue of treaty rights. Rather, the issue before the court in *Eberhardt* was whether the Secretary of the Interior had any authority, absent evidence of the "imminent

extinction" of the fishery resource, to ban Indian commercial fishing on-reservation. *Eberhardt*, 789 F.2d at 1358. The Ninth Circuit held that, even absent such a showing, such regulation "to protect and conserve the fishery resource for the benefit of the Indians," was not an abrogation of what the Court clearly held to be a well-established right to fish. *Id.* at 1359.

purposes. *See* discussion of HYSA, above.[6] Thus, the Hoopa Valley and Yurok Indians clearly have a federally reserved fishing right.

#### (ii) *Treaty Versus Non–Treaty Rights*

■ Plaintiffs' second argument is that only tribes with treaty rights should be accorded the power to regulate fishing off-reservation. This contention lacks merit. The federal power to reserve rights for Indians in conjunction with the creation of reservations may be exercised either through treaties, statutes, or executive actions pursuant to statutory authority. Court decisions upholding or recognizing the reserved fishing rights at issue have uniformly rejected a treaty versus non-treaty distinction. The Ninth Circuit addressed this very issue in *Blake v. Arnett:*

> Congress can create a reservation, reserve rights to the Indians, and dispose of the lands of the United States by statute as well as by treaty ...
>
> \* \* \* \* \* \*
>
> We do not think that the distinction between a treaty and a statute has great significance.
>
> \* \* \* \* \* \*
>
> [B]oth treaties and statutes are the supreme law of the land. Const. Art. VI. cl. 2.... [W]e believe that whether the source of a right is in a treaty or in a statute has little contemporary relevance.

663 F.2d at 909–910 (citation omitted). *See also United States v. Wilson,* 611 F.Supp. at 818 ("It makes little practical difference that

Congress granted these rights by statute rather than by treaty"); *Arnett v. Five Gill Nets,* 48 Cal.App.3d at 459, 121 Cal.Rptr. at 911 ("No reason appears why the manner in which the right was granted would make it more or less worthy of protection"); *McCovey,* 205 Cal.Rptr. at 652–53, 685 P.2d at 696–97.[7] *See also Arizona v. California,* 373 U.S. 546 at 598, 83 S.Ct. 1468, 1496, 10 L.Ed.2d 542 (1963) ("We can give but short shrift ... to the argument that the reservations either of land or water are invalid because they were originally set apart by the Executive") (water rights); *United States v. Walker River Irrigation District,* 104 F.2d 334, 336 (9th Cir.1939) ("We see no reason to believe that the intention to reserve need by evidenced by treaty or agreement. A statute or an executive order setting apart the reservation may be equally indicative of the intent.") (water rights).

#### (iii) *On–Reservation Versus Off-Reservation Rights*

■ Plaintiffs next argument concerns the scope of any fishing rights that the Tribes may possess. Plaintiffs contend that the Tribes' only right is an on-reservation right of access to the Klamath River and an on-reservation immunity from state regulation of fishing and that the Department of Commerce cannot regulate catch outside of the reservation to protect fish for the Tribes on reservation. However, plaintiffs do not provide any authority for their contention that the Tribes' fishing right is limited in this way.

---

**6.** While plaintiffs imply that because this right was not vested before 1988, it may not be enforced by restricting ocean fisheries, Indian property rights which are not vested as against congressional action are still protected and enforceable against third parties such as plaintiffs. *See F. Cohen's Handbook of Federal Indian Law,* 486–99 (R. Strickland ed. 1982) (tribal rights of occupancy afford the tribe enforceable property right against all but the federal government).

**7.** In response to California's petition for Supreme Court review of *Arnett v. Five Gill Nets,* Solicitor General Bork's brief for the United States noted:

> That executive orders played a prominent role in the creation of the Reservation does not

change this result [that the United States reserved to the Indians the right to fish on the Reservation without state interference]. Regardless of the manner in which a reservation is created the purpose is generally the same: to create a federally-protected refuge for the tribe....
>
> With respect to fishing rights we see no reason why a reservation validly established by executive order should be treated differently from other reservations.

Memorandum for the United States as Amicus Curiae, at 5, *Arnett v. Five Gill Nets,* (U.S. No. 75–527), *cert. denied,* 425 U.S. 907, 96 S.Ct. 1500, 47 L.Ed.2d 757 (1976).

As anadromous fish, Klamath River chinook do not live out their existence on the reservation. They spawn in the upper reaches of the Basin, migrate as juveniles to the ocean where they reach adult and harvestable size, and return to the river of their origin to spawn. Only when they return to the reservation are the fish of any value to the Tribes. A federally reserved fishing right is a right to an opportunity to obtain possession of a portion of the resource, which can best be expressed by either the numbers of fish taken or an allocation of the harvestable resource. *See United States v. Washington,* 520 F.2d 676, 687 (9th Cir.1975), *cert. denied,* 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976); *Puget Sound Gillnetters Ass'n v. U.S. Dist. Ct.,* 573 F.2d 1123, 1129 n. 6 (9th Cir.1978), *affirmed in part and vacated in part, Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979). Thus, for the Tribes' federally reserved fishing right to have any practical meaning, it must include regulation of activities occurring outside the reservation which negatively impact that right.

While the off-reservation regulation of fishery pursuant to non-treaty based tribal fishing rights appears to be a matter of first impression, it is clear that courts have upheld off-reservation regulation of fishery pursuant to treaty based fishing rights.[8] For example, courts have held that fishing activities outside of tribal fishing areas of the Pacific Northwest Tribes must be regulated to permit a sufficient return of the fishery resource to tribal fishing areas so that these tribes may have a meaningful opportunity to harvest their share of the resource. *See, e.g., Hoh Indian Tribe v. Baldrige,* 522 F.Supp.

683, 687 (W.D.Wash.1981) (the State cannot so manage the fishery that little or no harvestable portion of the fish reaches the Indian fishing areas; the Magnuson Act clearly places a responsibility on the United States to police ocean fishery by Washington citizens insofar as is necessary to assure compliance with the treaties); *U.S. v. Washington,* 459 F.Supp. 1020, 1070 (W.D.Wash.1978) (same); *Sohappy v. Smith,* 302 F.Supp. 899, 911 (D.C.Or.1969) (same). That the fishing rights in these cases arose through treaty rather than through statutory and executive authority does not affect the scope of the fishing right, as explained above.[9]

Further authority for the proposition that a reserved right can affect off-reservation rights in order to satisfy the tribal on-reservation right comes from the context of water rights cases. In *Winters v. United States,* 207 U.S. 564, 576, 28 S.Ct. 207, 211, 52 L.Ed. 340 (1908), the Court found an implied off-reservation restriction of water because it was necessary to fulfill the needs of on-reservation use and because the land of the reservation would have been valueless without water. *See also Arizona v. California,* 373 U.S. 546, 599, 83 S.Ct. 1468, 1497, 10 L.Ed.2d 542 (1963) (implied restriction found off-reservation where water essential to "life of the Indian people"); *Colville Confederated Tribes v. Walton,* 647 F.2d 42, 47 (9th Cir. 1981) (Congress has the power to reserve off-reservation water for use on-reservation because "Congress intended to deal fairly with the Indians by reserving waters without which their lands would be useless.")

The fishery here, no less than the water in the water rights cases, has been deemed "essential to the life of the Indian people" for

8. Contrary to plaintiffs' assertions, the fact that fulfilling a reserved tribal right may require regulation of activities outside the areas where the tribal right is enjoyed does not render the right an "off-reservation" right.

9. The cases plaintiffs cite to support their argument that only fishing rights provided through treaty may affect regulation of fishery off-reservation do not support that proposition. For example, plaintiffs rely upon *Wahkiakum Band of Chinook Indians v. Bateman,* 655 F.2d 176 (9th Cir.1981), and *United States v. Oregon,* 787 F.Supp. 1557 (D.Or.1992), for authority. At is-

sue in both cases were tribes seeking to be declared successors in interest to signatories of various treaties, which has no relevance to the instant case. Plaintiffs also cite *United States v. Forty–Eight Pounds of Rising Star Tea,* 35 F. 403 (D.C.N.D.Cal.1888), *aff'd,* 38 F. 400 (C.C.N.D. 1889) as authority. This case describes how a reservation was extended to include a fishing cannery so that it would not compete with the reservation fishery, and does not stand for the proposition that Indians with fishing rights through statutory or executive authority can only be helped on-reservation.

whom the reservation was created. *Arizona,* 373 U.S. at 599, 83 S.Ct. at 1497. Further, here, as with the Pacific Northwest treaty tribes, the Government has "recognized the vital importance of the fisheries to the Indians and wanted to protect them from the risk that non-Indian settlers might seek to monopolize their fisheries." *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 666, 99 S.Ct. 3055, 3064, 61 L.Ed.2d 823 (1979). The Court is also mindful that "[t]he United States, acting through the Secretary of the Interior, has charged itself with moral obligations of the highest responsibility and trust [towards reservation Indians]." *Pyramid Lake Paiute Tribe of Indians v. Morton,* 354 F.Supp. 252, 256–257 (D.D.C.1972). Thus, it appears entirely appropriate to the Court that this responsibility include the Department of Commerce's regulation of the ocean harvest of Klamath River salmon in order to provide the appropriate measure of the fishing rights of the Hoopa Valley and Yurok Tribes.

### (iv). *Magnuson Act Procedures and National Standards*

■ Plaintiffs also argue in support of their motion for partial summary judgment that Magnuson Act procedures and National Standards have been violated by the "agreement" between the Secretaries of Commerce and the Interior to "regulate all ocean seasons in accordance with the Interior Solicitor's Opinion." While plaintiffs make this argument in their opening brief, they drop it in their reply, leading the Court to conclude that they accept defendants' correction of their interpretation of the Magnuson Act and its National Standards. Further, plaintiffs' argument appears directed at challenging defendants' decision to allocate a 1993 harvest of 18,500 fall chinook salmon for in-river Indian fishery. The Court specifically stated it would not adjudicate the validity of any allocation on this motion in its order of February 1, 1994. Nonetheless, the Court addresses plaintiffs' allegations here insofar as it is desirable to lend clarity to the record.

Plaintiffs first allege that Commerce's management of the ocean fishery so as to accommodate Interior's allocation to the Tribes constituted an improper delegation of power from the Department of Commerce to the Interior, because the "Secretary of the Interior, (and his Solicitor) has no statutory role in the establishment of fishery management plans under the FCMA." This contention of plaintiffs is grounded in a misunderstanding of the Magnuson Act.

The Magnuson Act, and its National Standards, 16 U.S.C., § 1801 *et seq.,* apply to regulation of ocean harvesting in the Exclusive Economic Zone—the area from 3–200 miles seaward—and not to in-river fisheries. *See Pacific Coast Fed. v. Secretary of Commerce,* 494 F.Supp. 626, 631–633 (N.D.Cal. 1980) (rejecting plaintiffs' claim that the Council and the Secretary of Commerce should regulate in-river fisheries, and holding that the Secretary of Commerce had no jurisdiction over the "inland fisheries.") *See also* the Court's November 2, 1993 Order at 14: "the rivers running through the reservations are under the jurisdiction of the Department of the Interior."

Nonetheless, the Secretary of Commerce must manage the ocean fishery in a manner consistent "with any other applicable law," 16 U.S.C. § 1854(a)(1)(B) which, as we stated in our November 3, 1993 Order, we construe as including United States obligations to Indian reservations with respect to fishing rights. This is also acknowledged in the Fishery Management Plan ("FMP") for the affected area, which requires that any optimum yield for the ocean fishery must take into account the Indian fishery on the Klamath River. Therefore, the Secretary of Commerce's action in setting the 1993 allocation simply followed the Solicitor's Opinion defining the applicable law. This was not an improper delegation of power of Commerce to the Interior, as plaintiffs suggest.

Plaintiffs also contend that Defendants' actions are in violation of "applicable procedural requirements" of the Magnuson Act, and for support refer to their first motion for summary judgment under the Magnuson Act. The procedural claims plaintiffs raised in their first motion were already ruled upon by this Court in our previous orders and plaintiffs cannot seek to review them here.

In sum, plaintiffs fail to show that they are entitled to judgment as a matter of law that an allocation of fish from ocean fisheries to the Hoopa Valley and Yurok Tribes, as "non-treaty tribes," is unlawful. Accordingly, the Court dismisses plaintiffs' remaining claims under the Magnuson Act (plaintiffs' first cause of action), and denies plaintiffs' motion for partial summary judgment.

## II. PLAINTIFFS' MOTION TO STRIKE

 Plaintiffs move to strike three of defendants' exhibits appended to defendants' motion to dismiss, on the basis that these exhibits are "outside the pleadings." However, these exhibits were not submitted by defendants to prove factual matters outside the averments of the Amended Complaint. The Exhibits plaintiffs seek to strike are Bureau of Indian Affairs Public Notices and a BIA Federal Register Notice, all of which were issued pursuant to 25 CFR 250.12(a). Exhibit 2 is a notice in the nature of an interpretative rule, defining the eligibility criteria for Indian fishing on the Yurok and Hoopa Valley reservations, to bring these criteria into conformity with the Hoopa–Yurok Settlement Act (HYSA), 25 U.S.C. § 1300i et seq.[10] Exhibits 3 and 4 are notices setting the 1993 harvest allocation for the Indian in-river fishery.

Thus, these Exhibits constitute either applicable law, or adjudicative facts subject to judicial notice pursuant to F.R.E. 201, since they are outside of reasonable controversy. As a result, the Court denies plaintiffs' motion to strike defendants' exhibits.

## III. DEFENDANTS' MOTION TO DISMISS

Defendants first move to dismiss the claims which form the balance of plaintiffs' second, third, and fourth causes of action, which allege Secretary Babbitt's 1993 in-river fishery allocation for the Hoopa Valley and Yurok Tribes are discriminatory and violate due process. These causes of action involve 1) claims of Fifth Amendment and equal protection 42 U.S.C. § 1981 violations, and 2) claims of Fifth Amendment due process violations. Defendants also move to dismiss the claims which constitute plaintiffs' sixth cause of action, which alleges that Secretary Babbitt has violated the Klamath and Trinity River Acts. The Court will address these claims in turn.

### 1). Equal Protection and 42 U.S.C. § 1981 Claims

 Plaintiffs charge that the Secretary's authorization of a harvest of 18,500 fall chinook for the 1993 season was racially discriminatory, and violated the equal protection clause and 42 U.S.C. § 1981.[11] In order to succeed on either cause of action, plaintiffs must be able to allege racial discrimination as an element of their claim. General Building Contractors Ass'n v. Pennsylvania, 458

---

**10.** Plaintiffs specifically attack Exhibit 2, asserting that there has been "no properly adopted amendment of the C.F.R. in question," presumably meaning that the BIA change in the regulations should have been issued with notice and comment. However, interpretative regulations such as this notice do not require notice and comment proceedings.

Assuming that Exhibit 2 is not "properly adopted," plaintiffs attack the superseded regulation as defining "eligible Indian" to include not only tribal members but other persons, and claim this is racially discriminatory. However, as discussed below, classification on the basis of "Indian" status is neither racially discriminatory nor constitutionally impermissible. Further, federal law permits in limited circumstances recognition of certain Indians who demonstrate a sufficient nexus to Indian tribes. See 25 U.S.C. 479. In some circumstances such criteria that includes racial factors is not considered impermissible. See Alaska Chapter, Associated General Contrac-

tors of America v. Pierce, 694 F.2d 1162, 1168 (9th Cir.1982).

**11.** The Fourteenth Amendment to the U.S. Constitution provides that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const.Amend. XIV. The due process clause of the Fifth Amendment imposes on the federal government the limitations that the equal protection clause of the Fourteenth Amendment imposes on the states. Richards v. Secretary of State, Dept. of State, 752 F.2d 1413, 1415 n. 1 (9th Cir.1985).

The Civil Rights Act provides for equal rights under the law, and states that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens ..." 42 U.S.C. § 1981.

U.S. 375, 391, 102 S.Ct. 3141, 3150, 73 L.Ed.2d 835 (1982) ("[42 U.S.C.] 1981, like the Equal Protection Clause, can be violated only by purposeful discrimination.") However, plaintiffs fail to allege any cognizable claim of racial discrimination.

Plaintiffs allege that the allocations are racially based and discriminatory because "none of the tribes of said Indians have any treaty with the United States and some "Indians" are not tribal members." However, regulations regarding Indians are not considered "racial," regardless of whether the Indians in question are affiliated with treaty tribes.

Indians enjoy a "unique legal status," *Morton v. Mancari*, 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974), which derives from the Constitution through the "Indian Commerce Clause," Article I, Sec. 8, cl. 3, which provides Congress with the power to "regulate Commerce ... with the Indian Tribes," through Article II, Sec. 2, cl. 2, the treaty-making power, and from the special relationship between the Federal government and Indians. *Id.* at 552, 94 S.Ct. at 2483.

> Literally every piece of legislation dealing with Indian tribes and reservations ... single out for special treatment a constituency of tribal Indians living on or near reservations. If these laws, derived from historical relationships and explicitly designed to help only Indians, were deemed invidious racial discrimination, an entire Title of the United States Code (25 U.S.C.) would be effectively erased and the solemn commitment of the Government toward the Indians would be jeopardized. *Id.* at 552, 94 S.Ct. at 2483–84.

In *Mancari*, the Court explained that a Bureau of Indian Affairs Indian employment preference was not "racial" because it was granted to Indians "not as a discrete racial group, but, rather, as members of quasi-sovereign tribal entities." *Id.* at 554, 94

S.Ct. at 2484.[12] The Court further held that "[a]s long as the special treatment can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians," the regulation will not be disturbed. *Id.* at 555, 94 S.Ct. at 2485.

The Supreme Court revisited the question whether regulation of Indian affairs was racially based in *United States v. Antelope*, 430 U.S. 641, 97 S.Ct. 1395, 51 L.Ed.2d 701 (1977). Addressing a challenge that a federal criminal statute applied to Indians was racially discriminatory, the Court held that:

> [S]uch regulation is rooted in the unique status of Indians as "a separate people" with their own political institutions. Federal regulation of Indian tribes, therefore, is governance of once-sovereign political communities; it is not to be viewed as legislation of a " 'racial' group consisting of 'Indian'.... *Morton v. Mancari, supra,* 417 U.S. at 553 n. 24, 94 S.Ct. at 2484 n. 24.

The regulation in this case restricts on-reservation fall chinook tribal harvest based on the existence of federally-recognized Tribes and their respective reservations, and not on any "racial" classification. All Indians who are authorized by the Secretary to fish on the Hoopa Valley or Yurok reservations in 1993 had to be members of either Hoopa Valley or Yurok Tribes.[13] Thus, under the rule of *Mancari*, the regulation is not racially based, but is based on the political status of the Tribes.

Plaintiffs argue that because these Tribes are not parties to treaties with the United States, the allocation is racially based. However, courts have applied the rule set forth in *Mancari* in both treaty and non-treaty situations. *See Alaska Chapter, Assoc. Gen'l Contractors of America, Inc.*, 694 F.2d at 1168–1170 (applying the rule of *Mancari* to contract award preference for Indian-owned

**12.** In fact, the Court noted that the preference, applying only to members of federally recognized tribes, operated to exclude many people racially classified as Indian. *Mancari* at 553 n. 24, 94 S.Ct. at 2484 n. 24.

**13.** Prior to the 1988 Hoopa–Yurok Settlement Act, 25 U.S.C. 1300i *et seq.*, eligibility to participate in the on-reservation Indian fishery was

based on the criteria stated at 25 C.F.R. 250.5. In 1992, in order to conform the eligibility criteria to the Settlement Act, the Bureau of Indian Affairs, (BIA) issued a notice changing the criteria stated at 25 C.F.R. Part 250 to *require membership* in either the Hoopa Valley or Yurok Tribes. *See* defendants' Exhibit 2.

businesses in Alaska, where the treaty power does not apply, and under a statutory definition of "Indian" which involved classification based on blood quantum and recognition by a tribal or governmental entity); *Barona Group of Capitan Grande Band of Mission Indians v. American Mgmt. and Amusement*, 824 F.2d 710, 722–723 (9th Cir.1987) (*Mancari* rule applied in case involving 25 U.S.C. 81, which applies to all tribes).

Plaintiffs do not cite a single case to support their claim that the fishery allocation presents a cognizable § 1981 or equal protection claim. Plaintiffs' entire opposition to defendants' motion on the issue of racial classification consists of their motion to strike, which the Court denies. Since it appears beyond doubt that plaintiffs can prove no set of facts in support of their equal protection and § 1981 claims which would entitle them to relief, these claims are dismissed.

### 2). *Due Process Claims*

Plaintiffs' due process argument is that they have a right of access to "federal ocean fisheries" under the Magnuson Act and that they were deprived of this right without notice or a hearing before issuance of defendants' 1993 harvest regulations.[14] As this Court has previously noted, the Magnuson Act was enacted in response to the overfishing of ocean stock which was threatening commercial and recreational fisheries, as well as the very survival of some species. 16 U.S.C. 1801(a). To accomplish the goals of the Magnuson Act, Congress established an "exclusive economic zone," ("EEZ"), within which the Department of Commerce would exercise jurisdiction. 16 U.S.C. 1811(a).

■ Thus, the Magnuson Act confers on the Secretary of Commerce authority to manage the fishery resources in the EEZ for conservation. It does not confer on commercial fishermen any right or title in the fishery resources under the Department of Commerce's authority. Plaintiffs do not point to any language in the Magnuson Act showing Congressional intent that the fishing privileges that may be afforded under the Act to ocean users of the fishery resource vests in them a property right protected by the Fifth Amendment.

■ Further, plaintiffs can have no property right in the migratory fish themselves. *See Douglas v. Seacoast Products, Inc.*, 431 U.S. 265, 284, 97 S.Ct. 1740, 1751, 52 L.Ed.2d 304 (1977) ("it is pure fantasy to talk of 'owning' wild fish, birds, or animals.") In addition, plaintiffs have no right to fish which implicates property interests, nor do they have any legitimate claim of entitlement. While they may have an expectation of participation, "a unilateral expectation" of a benefit is insufficient to establish a property interest. *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972).

Plaintiffs' entire written argument in opposition to defendants' motion to dismiss their due process claim consists of their motion to strike and one footnote asserting that *Vietnamese Fishermen Ass'n of America, et al. v. California Department of Fish & Game, et al.*, 816 F.Supp. 1468 (N.D.Cal.1993) recognizes that fishermen have a property right to fish. However, as plaintiffs conceded at oral argument, that proposition is nowhere stated in that case. Again, since it appears beyond doubt that plaintiffs can prove no set of facts in support of their due process claim which would entitle them to relief, these claims are dismissed. Thus, the Court dismisses plaintiffs' second, third, and fourth causes of action.

### 3). *Restoration of the Klamath and Trinity Rivers Claims*

The second category of claims defendants seek to dismiss are those involving alleged violations of two statutes which provide for restoration of the Klamath and Trinity Rivers. (plaintiffs' sixth cause of action). Plaintiffs assert in this regard that Defendant

---

14. The Fifth Amendment to the U.S. Constitution provides that "[n]o person shall ... be deprived of life, liberty or property, without due process of law...." U.S. Const.Amend V. Discrimination that is "so unjustifiable as to be violative of due process," is considered to be within the Fifth Amendment concept of due process. *Bolling v. Sharpe*, 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954).

Babbitt has failed to comply with his restoration responsibilities and has failed to regulate in-river fishing to protect the fishery.

### A). *Standing*

 First, defendants move to dismiss these claims because plaintiffs lack standing, since they have not alleged that they have suffered or will suffer a concrete injury. Article III of the Constitution limits the judicial power of federal district courts to "cases and controversies."

> It is not enough that a litigant claims that a violation of federal law has occurred; the litigant must have "standing" to invoke the power of a federal court.

*Fernandez v. Brock,* 840 F.2d 622, 625 (9th Cir.1988). To establish standing under Article III, a plaintiff must allege three elements. First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, *Warth v. Seldin,* 422 U.S. 490, 508, 95 S.Ct. 2197, 2210, 45 L.Ed.2d 343 (1975), and (b) "actual or imminent, not 'conjectural' or 'hypothetical,'" *Whitmore v. Arkansas,* 495 U.S. 149, 155, 110 S.Ct. 1717, 1723, 109 L.Ed.2d 135 (1990). Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of some third party not before the court." *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 41–42, 96 S.Ct. 1917, 1926, 48 L.Ed.2d 450 (1976). Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife,* — U.S. ——, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

 The party invoking federal jurisdiction bears the burden of establishing these elements. *Id.* At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we "presum[e] that general allegations embrace those specific facts that are necessary to support the claim," *Lujan v. National Wildlife Federation,* 497 U.S. 871, 889, 110 S.Ct. 3177, 3189, 111 L.Ed.2d 695 (1990).

 Given the low threshold plaintiffs must pass to survive a motion to dismiss, plaintiffs' allegations satisfy the first requirement to show standing. In the complaint, plaintiffs allege the following: that they have been "severely impacted" by "defendants' actions"; that defendants Babbitt and the Department of the Interior are charged with restoring and maintaining fish runs in the Klamath; that the status of the Klamath River runs is the direct result of the failure and refusal by Secretary Babbitt to improve and protect the habitat and restore runs by stocking fish; and that defendants have failed and refused to protect Klamath River runs.

These pleadings suffice to allege injury, since the Court understands the complaint to allege that plaintiffs have suffered decreased fishing opportunity as a result of defendants' inaction, although this is not explicit in the complaint.[15] Further, because on a motion to dismiss we "presum[e] that general allegations embrace those specific facts that are necessary to support the claim," *Lujan v. National Wildlife Federation,* 497 U.S. at 889, 110 S.Ct. at 3189, the Court finds that plaintiffs successfully plead that their decreased fishing opportunity is caused by the conditions which the Acts seek to address, and that the relief they seek—an order directing defendants to implement measures to improve Klamath River runs—will likely redress their injury. Thus, the Court denies defendants' motion to dismiss plaintiffs' claims on the ground that plaintiffs do not successfully allege standing.

**15.** In their written brief, plaintiffs misstate the test that must be met to allege injury in order to show standing. Plaintiffs argue that because they fall within the "zone of interests" Congress intended to protect through the Klamath and Trinity Acts, they are injured parties whose interests these acts are designed to protect. However, plaintiffs are confusing prudential consider-

ations regarding a "zone of interests" with the constitutional Article III requirement of injury. Establishing Article III standing is a precursor to addressing prudential considerations. *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970).

### B). *Judicial Review*

Although the Court finds that plaintiffs successfully allege standing, plaintiffs do not successfully allege a basis for judicial review. Neither the Klamath Basin Act nor the Trinity Basin Act (the "Acts") contain provisions granting a private right of action. Plaintiffs seek judicial review pursuant to the Administrative Procedure Act ("APA"), or, in the alternative, assert there to be an implied private right of action in the Acts.

#### i). *Judicial Review Under the APA.*

Plaintiffs have generally alleged jurisdiction under the APA, 5 U.S.C. § 551 *et seq.* When jurisdiction is alleged pursuant to the APA, a plaintiff can claim a right to judicial review under § 10(a) of the APA, which provides:

> A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.

5 U.S.C. § 702. This provision contains two separate requirements. First, the person claiming a right to sue must identify some "agency action" that affects her in the specified fashion. *Lujan v. National Wildlife Federation,* 497 U.S. 871, 881–82, 110 S.Ct. 3177, 3185, 111 L.Ed.2d 695 (1990). Second, the party must show she has suffered legal wrong, or has been adversely affected or aggrieved by that action. *Id.*

Plaintiffs' complaint refers to no specific action or inaction that violates the Acts, but only generally states that Secretary Babbitt has failed to implement measures to improve Klamath River Runs, including habitat improvement and fish planting measures. Plaintiffs do not attempt to meet the test laid out in *Lujan.* Rather, according to plaintiffs, because they allege general agency *inaction,* review is available under 5 U.S.C. § 706(1) which authorizes a district court to "compel agency action *unlawfully withheld or unreasonably delayed* " (emphasis added).

However, the claims plaintiffs present here do not match what is required to invoke 5 U.S.C. § 706(1). Courts which have reviewed claims of delay pursuant to this provision have done so in the context of specific allegations of inaction, usually in the context of delayed administrative review of a plaintiff's claim before an agency, or of delayed agency rulemaking. *See Telecommunications Research & Action v. F.C.C.,* 750 F.2d 70 (D.C.Cir.1984), *Public Citizen Health Research Group v. Comm'r Food and Drug Admin.,* 740 F.2d 21 (D.C.Cir.1984). Plaintiffs do not point to any authority to support their position that 5 U.S.C. § 706(1) can be utilized to review the kind of claim of agency inaction here made by plaintiffs.

#### ii). *Implied Private Right of Action.*

Plaintiffs alternatively contend that the Acts contain an implicit private right of action. Whether the Acts confer a private right of action is determined by the four-part test announced by the Supreme Court in *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975): (i) the plaintiff must belong to the class for whose *especial* benefit the statute was created; (ii) the legislature must have shown an intent, either explicitly or implicitly, to create a private remedy; (iii) finding an implied cause of action must be consistent with the underlying purposes of the statute; and (iv) the cause of action must not be one that has traditionally been left to state law. An evaluation of the other elements is not necessary if the Court finds that Congress did not intend to create a private cause of action. *See California v. Sierra Club,* 451 U.S. 287, 298, 101 S.Ct. 1775, 1781, 68 L.Ed.2d 101 (1981); *Stupy v. Postal Service,* 951 F.2d 1079, 1081 (9th Cir. 1991).

There is no indication that Congress intended the Acts to provide a basis for a private right of action. The search for legislative intent begins with an examination of the language of the statute and then proceeds to a review of the legislative history and the application of traditional aids to statutory interpretation. *See Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n,* 453 U.S. 1, 13, 101 S.Ct. 2615, 2622, 69 L.Ed.2d 435 (1981).

An examination of the language of the Acts indicates no intent to provide for a private cause of action. Rather, the text of the Acts provides that task forces to formulate management programs and to coordinate man-

agement activities among federal, state and local agencies are to be established. Trinity Basin Act, 98 Stat. at 2721, 2722–23 and Klamath Basin Act, 16 U.S.C. § 460ss–1 to –3. The Klamath Basin Act explicitly mandates membership of the Task Force to include representatives of the commercial salmon fishing industry, the in-river sport fishing community, the Department of the Interior, and the Hoopa Valley and Yurok Tribes, indicating that Congress intended the members of these various groups to communicate and resolve disputes through direction of the Task Force. 16 U.S.C. § 460ss–3(c)(1)(A).

Nor does the legislative history indicate any congressional intent to create a private cause of action. Plaintiffs point to legislative history discussing the seriousness of the degradation of the Klamath and Trinity Rivers and the frustration with past federal inaction felt by many who testified at the hearings on the proposed Acts. However, these facts do not suffice to show legislative intent to create a private remedy. Thus, plaintiffs successfully allege neither an implied private right of action nor a basis for judicial review pursuant to the APA.

Lastly, plaintiffs suggested in their written briefs that the Court should stay consideration of defendants' motion to dismiss pending intervention of either the Yurok or Hoopa Valley Tribes. Plaintiffs in fact assert that the parties have stipulated to such an intervention. However, defendants state that no such stipulation has been agreed to, and indeed, no such stipulation has been filed with the Court. Therefore, the Court declines to stay consideration of defendants' motion for this reason. Plaintiffs' sixth cause of action is therefore dismissed.[16]

*CONCLUSION:*

For the foregoing reasons, defendants' motion to file a supplemental opposition is granted, and plaintiffs' motion for a partial summary judgment is denied. Plaintiffs' motion to strike is denied, and defendants' mo-

tion to dismiss plaintiffs' remaining claims is granted. Further, as there are no remaining causes of action in the complaint, the action is dismissed in its entirety.

IT IS SO ORDERED.

---

**16.** Plaintiffs also allege in their complaint that their sixth cause of action should not be dismissed because it is based on Secretary Babbitt's "trust responsibility." There are *no specific* pleadings whatsoever regarding this violation, and plaintiffs only address this claim in their motion to dismiss by citing to two cases, which do not suffice to clarify how Secretary Babbitt has allegedly violated a "trust responsibility."